## MISSOURI, KANSAS AND TEXAS RAILWAY COMPANY *v.* ROBERTS.

**ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.**

No. 230. Argued and submitted January 30, 1894.—Decided March 5, 1894.

The original claim of the State of Kansas to the school-lands in townships 16 and 36 in that State, was rejected by Congress and abandoned by the State, and the right of Congress was conceded to the absolute control of the lands thus embraced and of lands set apart for the use of Indians until such right should be extinguished by appropriate legislation.

By the act of July 26, 1866, c. 270, 14 Stat. 289, granting a right of way to the company subsequently known as the Missouri, Kansas and Texas Railway Company across the public lands in the State of Kansas, the title of the lands composing that right of way, including townships 16 and 36, when crossed by it, became vested in that company.

THE case is stated in the opinion.

*Mr. Thomas N. Sedgwick,* (with whom was *Mr. James Hagerman* on the brief,) for plaintiff in error.

*Mr. Nelson Case,* for defendant in error, submitted on his brief.

MR. JUSTICE FIELD stated the case and delivered the opinion of the court.

This is an action of ejectment to recover possession of certain lands situated in section sixteen (16) of township thirty-four (34) in the county of Labette, State of Kansas, occupied and used by the Missouri, Kansas and Texas Railway Company as part of its right of way, to which it claims title under the act of Congress of July 26, 1866, granting lands to the State of Kansas to aid in the construction of a southern branch of the Union Pacific Railway and Telegraph Company from Fort Riley, Kansas, to Fort Smith, Arkansas. Act of July 26, 1866, c. 270, 14 Stat. 289.

The act declares that, for the purpose of aiding the Union Pacific Railway Company, southern branch, that being a corporation then organized under the laws of Kansas, to construct and operate a railroad from Fort Riley, in that State, or near that military reservation, thence down the valley of the Neosha River to the southern line of the State, with a view to the extension of the same through a portion of the Indian Territory to Fort Smith, Arkansas, there was thereby granted to that State, for the use and benefit of the railroad company, every alternate section of land or parts thereof designated by odd numbers, to the extent of five alternate sections per mile on each side of its road, and not exceeding in all ten sections per mile; provided that in case it should appear that the United States had, when the line of the railroad was definitely located, sold any sections, or any part thereof, granted as aforesaid, or that the right of preëmption or homestead settlement had attached to the same, or that it had been reserved by the United States for any purpose whatever, then it should be the duty of the Secretary of the Interior to cause to be selected for the purposes stated, from the public lands of the United States nearest to the sections specified, so much land as should be equal to the amount of the lands sold, reserved, or otherwise appropriated, or to which the right of a homestead settlement or preëmption had attached. But to the said act a proviso was attached that any and all lands reserved to the United States by any act of Congress or in any other manner, by competent authority, for the purpose of aiding in any object of internal improvement, or other purposes whatever, were reserved and excepted from the operation of the act, except so far as it might be found necessary to locate the route of said road through such reserved lands, in which case the right of way, two hundred feet in width, was thereby granted, subject to the approval of the President of the United States.

The Union Pacific Railway Company, southern branch, the corporation designated in the act of Congress, was organized by the legislature of Kansas, and incorporated on the 25th day of September, 1865, under an act providing for the incor-

poration and regulation of railroad companies; and on the 3d day of February, 1870, its name was changed to that of the Missouri, Kansas and Texas Railway Company, under which designation it is one of the defendants herein.

Certain lands within the present State of Kansas were reserved whilst it was still a Territory, and long previously, by the United States, for the use and occupation of the Osage Indians. Such reservation was made by treaty between them and the United States concluded as far back as June 2, 1825, and proclaimed in December following. 7 Stat. (Indian Treaties) 240. From that time, and continuously thereafter, the reserved lands were occupied by those Indians until the treaty ceding the lands, or parts thereof, to the United States, concluded in 1866, and proclaimed in January, 1867, (14 Stat. 687,) except such portion thereof as was appropriated and used as a right of way by the Missouri, Kansas and Texas Railway Company for its road under the grant of July 26, 1866. Prior to June 6, 1870, that company located its railroad through these reserved lands in Kansas, with the approval of the President, and constructed its road in substantial conformity with the act of Congress. The right of way for its road, two hundred feet in width, was granted to the company unconditionally, subject only to such approval. The title to the land for the two hundred feet in width thus granted vested in the company either upon the passage of the act of Congress, July 26, 1866, or upon the construction of the road, and so far as the present case is concerned, it does not matter which date be taken.

The United States had the right to authorize the construction of the road of the Missouri, Kansas and Texas Railway Company through the reservation of the Osage Indians, and to grant absolutely the fee of the two hundred feet as a right of way to the company. Though the lands of the Indians were reserved by treaty for their occupation, the fee was always under the control of the government; and when transferred, without reference to the possession of the lands and without designation of any use of them requiring the delivery of their possession, the transfer was subject

to their right of occupancy; and the manner, time and conditions on which that right should be extinguished were matters for the determination of the government, and not for legal contestation in the courts between private parties. This doctrine is applicable generally to the rights of Indians to lands occupied by them under similar conditions. It was asserted in *Butts* v. *The Northern Pacific Railroad Company,* 119 U. S. 55, and has never, so far as we are aware, been seriously controverted. In that case, the lands were within what is known as Indian country, where the right of the Indians to the occupancy of their lands was recognized; and in grants by the government of portions thereof for works of internal improvement, there usually was a stipulation for its extinguishment as rapidly as might be consistent with public policy and the welfare of the Indians. Such a stipulation was given when the grant under consideration in the case cited was made, showing that the government intended the grant to take effect notwithstanding any existing right of occupancy by the Indians, and it was deemed a sufficient expression of its intention to that effect. No such stipulation was made when the grant of the right of way through the Osage reservation was made, but the uses to which the lands were to be applied necessarily involved their possession. That grant was absolute in terms, covering both the fee and possession, and left no rights on the part of the Indians to be the subject of future consideration. Though the law as stated with reference to the power of the government to determine the right of occupancy of the Indians to their lands has always been recognized, it is to be presumed, as stated by this court in the *Butts case,* that in its exercise the United States will be governed by such considerations of justice as will control a Christian people in their treatment of an ignorant and dependent race, the court observing, however, that the propriety or justice of their action towards the Indians, with respect to their lands, is a question of governmental policy, and is not a matter open to discussion in a controversy between third parties neither of whom derives title from the Indians. The right of the United States to

dispose of the fee of land occupied by them, it added, has always been recognized by this court from the foundation of the government.　There · are, however, certain well-established doctrines controlling the action of the government, which can always be invoked to prevent hasty and improvident action against the Indians.　It has always been held that the occupancy of lands set apart by statute or treaty with them for their use cannot be disturbed by claimants under other grants of the government not indicating its intention, either in express terms or by the uses to which the lands are to be applied, to change the possession of the lands.

And the setting apart by statute or treaty with them of lands for their occupancy is held to be of itself a withdrawal of their character as public lands, and consequently of the lands from sale and preëmption.

The right and power of the government to dispose of the fee of the lands in·controversy occupied by the Osage Indians, with their rights of occupancy, having been exercised, and a grant of both fee and possession having been made to the Missouri, Kansas and Texas Railway Company, it follows that this company, the plaintiff in error, is entitled to a reversal of the judgment unless the claim of the plaintiff below, the defendant in error here, rests upon tenable grounds, and to them we will now turn our attention.　Roberts, the plaintiff below, traces his title to the premises through a patent from the State of Kansas to his grantor, dated May 25, 1871, and by conveyance from him, claiming that they constituted a portion of the lands ceded to the State for school purposes prior to the grant of Congress to the railway company under the act of July 26, 1866.

On the 30th of May, 1854, Congress passed an act (c. 59, 10 Stat. 277, 289) to organize the Territories of Nebraska and Kansas.　The sections of the act from the nineteenth to the thirty-seventh inclusive, relate to the Territory of Kansas. Section thirty-four (34) provided " that when the lands in the said Territory shall be surveyed under the direction of the government of the United States, preparatory to bringing the same into market, sections numbered sixteen and thirty-

six in each township in said Territory shall be, and the same are hereby, reserved for the purpose of being applied to schools in said Territory and in the States and Territories hereafter to be erected out of the same."

If the reservation named was intended as a grant of the sections sixteen (16) and thirty-six (36) to the Territory and to the States to be created out of them, or as a dedication of them for schools, it could only apply to such lands as were public lands, for no other lands in our land system are subdivided into sections, nor could it embrace lands which had been set apart and reserved by statute or treaty with them for the use of the Indians, as was the case with the lands involved in this controversy, as we have already shown. As early as 1839 it was held in *Wilcox* v. *Jackson*, 13 Pet. 498: "That a tract lawfully appropriated to any purpose becomes thereafter severed from the mass of public lands, and that no subsequent law or proclamation will be construed to embrace or operate upon it, although no exception be made of it." The reservation referred to there was of land for military purposes; and in *Leavenworth, Lawrence and Galveston Railroad* v. *United States*, 92 U. S. 733, 745, it was said that this doctrine " applies with more force to Indian than to military reservations. The latter," the court observed, " are the absolute property of the government. In the former other rights are vested. Congress cannot be supposed to grant them in a subsequent law, general in its terms. Specific language, leaving no room for doubt as to the legislative will, is required for such a purpose."

The present constitution of Kansas was proposed by a convention of people in the then Territory, July 29, 1859, with specified boundaries. An ordinance of the convention, preceding it, recites that, " whereas the Government of the United States is the proprietor of a large portion of the lands included in the limits of the State of Kansas as defined by this constitution; and whereas the State will possess the right to tax said lands for purposes of government and for other purposes: Now therefore, be it ordained by the people of Kansas that the right of the State of Kansas to tax said lands is relin-

quished forever, and the State of Kansas will not interfere with the title of the United States to such lands nor with any regulation of Congress in relation thereto, nor tax non-residents higher than residents, *Provided always*, that the following conditions be agreed to by Congress," among which conditions was the following : " That ' sections numbered six-teen (16) and thirty-six (36) in each township in the State, *including Indian reservations and trust lands*, shall be granted to the State for the exclusive use of common schools ; and when either of said sections or any part thereof has been disposed of, other lands of equal value, as nearly contiguous thereto as possible, shall be substituted therefor.' " 1 Charters and Constitutions, 629, 630.

Congress did not accept the proposed constitution with the conditions designated, but on the contrary, in its act for the admission of the State into the Union, passed on the 29th of January, 1861, c. 20, 12 Stat. 126, 127, after declaring that the State was admitted on an equal footing with the original States in all respects whatever, and, describing its boundary, added a clause, containing the following provisions among others : " *Provided*, That nothing contained in the said con-stitution respecting the boundary of said State shall be construed to impair the rights of person or property now pertaining to the Indians in said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, . . . or to affect the authority of the Government of the United States to make any regulation respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent to make if this act had never been passed." By this provision Congress reserved to itself the right to make all needful regulations for the government of the Indians, and for the use and disposition of their lands and other property. The Indians continued thereafter as previously in possession of the lands, and their rights, what-ever their nature and extent, were not extinguished by any-thing in the act of admission of the State into the Union, nor at the time of the grant of a right of way by the act of July 26, 1866.

Congress went further, and rejected in express terms the claims of the State asserted in the ordinance accompanying the proposed state constitution. By section 3 of the act of admission it declared that the act of admission should not be construed as an assent to all or any of the propositions or claims contained in the ordinance accompanying the proposed constitution or in the resolutions attached, but at the same time it made certain propositions, which it offered to the people of the State for compliance or rejection, and which, if accepted, should be held obligatory upon the United States and upon the State.

One of these propositions declared " that sections numbered sixteen and thirty-six in every township of *public lands* in said State, and where either of said sections or any part thereof has been sold or otherwise been disposed of, other lands equivalent thereto and as contiguous as may be, shall be granted to said State for the use of schools." And the several propositions were followed by the declaration that they were offered " on the condition that the people of Kansas shall provide by an ordinance, irrevocable without the consent of the United States, that said State shall never interfere with the primary disposal of the soil within the same by the United States or with any regulations Congress may find necessary for securing the title in said soil to *bona fide* purchasers thereof."

These several provisions were accepted by the State of Kansas, by a joint resolution of its legislature, January 20, 1862, in this language: " That the propositions contained in the act of Congress entitled ' An act for the admission of Kansas into the Union,' are hereby accepted, ratified, and confirmed, and shall remain irrevocable, without the consent of the United States; and it is hereby ordained that this State shall never interfere with the primary disposal of the soil within the same by the United States or with any regulations Congress may find necessary for securing the title to said soil, to *bona fide* purchasers thereof; and no tax shall be imposed on lands belonging to the United States."

It is clear beyond any doubt from this statement of the

legislation of Congress and of Kansas, and the accepted conditions upon which that State was admitted into the Union, that her original claim to the school sections in townships sixteen and thirty-six of the State was rejected by Congress, and abandoned by the State, and the right of Congress was conceded to the absolute control of the lands thus embraced and of lands set apart for the use of the Indians until such right ·should be extinguished by appropriate legislation. This rejection by Congress of the original claim of Kansas to the school lands in townships sixteen (16) and thirty-six (36), and its subsequent abandonment by the State itself, and the concession to Congress of the right of absolute control of the lands until such right should be extinguished by appropriate legislation, distinguishes the case materially from that of Wisconsin, which was considered in *Beecher* v. *Wetherby*, 95 U. S. 517, and upon which the defendant in error principally relies. No such right was relinquished until after the grant of the right of way under the act of Congress of July 26, 1866, to the Missouri, Kansas and Texas Railway, and the title of the lands composing that right of way had become vested in that company.

It follows, therefore, that the Supreme Court of the State, the court below, erred in sustaining the judgment of the inferior court of the State, in favor of the plaintiff in that court, the defendant in error here, and the judgment of the Supreme Court must therefore be

*Reversed, and the cause remanded with directions to take further proceedings in accordance with this opinion.*