MERCANTILE TRUST CO. v. ATLANTIC & P. R. CO. (POSTAL TELE-GRAPH CABLE CO., Intervener).

(Circuit Court, S. D. California. October 19, 1894.)

**1. GRANT OF RAILROAD RIGHT OF WAY—FEE OR EASEMENT.**

Act July 27, 1866 (14 Stat. 292), granting a railroad right of way over public land, as to which no provision is made for issuing evidence of title, and granting to the railroad company, in aid of construction, various sections of public land, for which patents were to issue to it, does not carry the fee to the right of way, but only an easement therein. Railway Co. v. Roberts, 14 Sup. Ct. 496, 152 U. S. 114, explained.

**2. RAILROADS — CONTRACTS WITH TELEGRAPH COMPANIES — DISCRIMINATING AGAINST COMPETING LINES.**

A railroad company, which is not only a common carrier, but, by the act incorporating it (Act July 27, 1866), is declared to be a post route and military road, cannot make a valid contract with a telegraph company on the right of way not to furnish facilities for the construction of a competing line; and it cannot, therefore, refuse to carry and distribute material for the construction of such line.

Intervention by the Postal Telegraph Cable Company in the suit of the Mercantile Trust Company against the Atlantic & Pacific Railroad Company.

For former report, see 63 Fed. 513.

Lamme & Wilde and F. J. Loesch, for intervening petitioner.

L. M. Estabrook and R. B. Carpenter, for Western Union Tel. Co.

ROSS, District Judge. The ruling upon the demurrer to the intervening petition of the Postal Telegraph Cable Company adjudged the right of that company to erect its line of telegraph upon and along the right of way of the Atlantic & Pacific Railroad Company between the Needles and Mojave, in this judicial district, if such could be done without interference with the use of the right of way by the railroad company for ordinary travel. The reasons for that determination were stated in the opinion filed by the court at

the time. Thereafter, counsel for the Western Union Telegraph Company, who, by the consent and authority of the receivers of the Atlantic & Pacific Railroad Company, had filed in their name the demurrer, obtained from the court leave to file, and did file, an answer thereto in the name of the Western Union Telegraph Company; and upon the issues thus joined evidence was taken which shows, among other things, an acceptance by the Postal Telegraph Cable Company of the conditions imposed by the act of congress of July 24, 1866 (14 Stat. 221; Rev. St. § 5263), and that the erection of a line of telegraph by that company upon and along the right of way of the Atlantic & Pacific Railroad Company, from the Needles to Mojave, will not in any manner interfere with the use of the right of way by the railroad company for ordinary travel. If, therefore, the court was right in its ruling upon the demurrer, it follows that by congressional grant the Postal Telegraph Cable Company has the right to erect its line of telegraph upon and along the right of way in question. It is, however, urged on behalf of the Western Union Telegraph Company that the ruling of this court upon the demurrer is inconsistent with the decision of the supreme court in the case of Railway Co. v. Roberts, 152 U. S. 114, 14 Sup. Ct. 496; that the ruling of the supreme court in that case, applied to the grant of the Atlantic & Pacific Railroad Company, shows that that grant conveyed to the Atlantic & Pacific Company the fee of its right of way, free from the operation of the act of July 24, 1866, and from any rights thereby conferred upon telegraph companies complying with its conditions.

In ascertaining what a court, in any given case, has decided, the first important thing to do is to see what was before the court for decision. And so, in looking at the case of Railway Co. v. Roberts, 152 U. S. 114, 14 Sup. Ct. 496, it is seen that it was an action of ejectment, involving the right of possession of certain lands situated in section 16 of township 34 in the county of Labette, state of Kansas, occupied and used by the Missouri, Kansas & Texas Railway Company as part of its right of way, to which it claimed title under the act of congress of July 26, 1866, granting lands to the state of Kansas to aid in the construction of a southern branch of the Union Pacific Railway & Telegraph Company from Ft. Riley, Kan., to Ft. Smith, Ark. 14 Stat. 289. That act granted to the state of Kansas, for the use and benefit of the railroad company, every alternate section of land, or parts thereof, designated by odd numbers, to the extent of 5 alternate sections per mile on each side of its road, and not exceeding in all 10 sections per mile: provided, that in case it should appear that the United States had, when the line of the railroad was definitely located, sold any of the sections, or any part thereof, granted as aforesaid, or that the right of pre-emption or homestead settlement had attached to the same, or that it had been reserved to the United States for any purpose whatever, then it should be the duty of the secretary of the interior to cause to be selected, for the purposes stated, from the public lands of the United States nearest to the sections specified, so much land as should be equal to the amount of the land sold, reserved, or other-

wise appropriated, or to which the right of a homestead settlement or pre-emption had attached. But to the act a proviso was attached that any and all lands reserved to the United States by any act of congress, or in any other manner, by competent authority, for the purpose of aiding in any object of internal improvement or other purposes whatever, were reserved and excepted from the operation of the act, except so far as might be found necessary to locate the route of said road through such reserved lands, in which case the right of way 200 feet in width was thereby granted, subject to the approval of the president of the United States. It will be seen that by the last proviso mentioned all lands reserved to the United States by competent authority, for any purpose whatever, were reserved and excepted from the operation of the grant, except so far as it might be found necessary to locate the route of the road through such reserved lands, in which case the right of way 200 feet in width was thereby granted, subject to the approval of the president. The action was brought in one of the courts of the state of Kansas by Roberts, who claimed under a patent issued by that state to his grantor for the premises as part of the lands ceded to the state by congress for school purposes; the patent having been issued prior to the grant of July 26, 1866, made by congress to the railway company. At the time of the last-mentioned grant the disputed premises constituted a part of the lands reserved by treaty made and promulgated in 1825 for the use and occupancy of the Osage Indians. Being an action of ejectment, the question involved was the right of possession of the lands included in the right of way granted to the railway company. The trial court gave the plaintiff judgment, which judgment was, on appeal to the supreme court of the state, affirmed. The case having been taken to the supreme court of the United States, that tribunal reversed the judgment of the state supreme court, holding that under the "legislation of congress and of Kansas, and the accepted conditions upon which that state was admitted into the Union, that her original claim to the school sections in townships 16 and 36 of the state was rejected by congress and abandoned by the state, and the right of congress was conceded to the absolute control of the lands thus embraced, and of lands set apart for the use of the Indians, until such right should be extinguished by appropriate legislation. * * * No such right was relinquished until after the grant of the right of way under the act of congress of July 26, 1866, to the Missouri, Kansas & Texas Railway, and the title of the land composing that right of way had become vested in that company,"—and further holding that lands reserved for the occupancy of Indians are subject to the absolute disposition of congress, and that the possession as well as the fee of such lands may be disposed of by congress either expressly or by necessary implication; that while nothing was said in the grant to the railway company of the right of way through the Osage reservation, in respect to the Indian occupancy thereof, the uses to which the lands within the right of way were to be applied necessarily involved their possession. It is true the court also said that the grant covered "both the fee and possession, and

left no rights on the part of the Indians to be the subject of future consideration." But it is to be observed that the question the court was discussing was as to the right of congress to make absolute disposition of lands reserved for the use and occupancy of the Indians, the court holding that this right applies both to the fee and the possession. No point appears to have been made in the case as to whether the right of way there granted to the railway company was but an easement, or carried the fee, nor was such point necessarily involved, since the grant of the right of way for the construction of the railroad, whatever its nature, necessarily carried the right of possession thereto, as against any inconsistent use thereof. I do not think, therefore, that the case of Railway Co. v. Roberts should be held to be an adjudication by the supreme court that a grant of the right of way over the public domain is not the grant of an easement therein, but necessarily carries the fee thereof, or that the court so intended it, especially where, as in the case at bar, the act of congress grants to the railroad company various sections of the public lands, for which, it is provided, patents shall be issued by the officers of the government, and also grants the right of way over lands of the government, for which no provision is made for the issuance of any evidence of title. Of course, this distinction in the grant between the lands granted in aid of the construction of the road, and the right of way therefor, is not conclusive, for the fee of land may be granted by direct act of congress. But, in my opinion, it strongly indicates that congress did not intend that the grant of the right of way to the Atlantic & Pacific Railroad Company should cover the fee of the lands included only within the right of way, but only such an easement therein as, under the settled rules of law, is usually covered by such grants. Williams v. Railway Co. (Wis.) 5 N. W. 482; Lumber Co. v. Harris (Tex. Sup.) 13 S. W. 453; St. Onge v. Day (Colo. Sup.) 18 Pac. 278; Railroad Co. v. Lesueur (Ariz.) 19 Pac. 157; Mills, Em. Dom. § 110. It follows from these views that the ninth clause of the contract entered into June 1, 1872, between the Atlantic & Pacific Railroad Company and the Western Union Telegraph Company, referred to in the intervening petition of the Postal Telegraph Cable Company, and set up in the answer of the Western Union Telegraph Company, by which it was, among other things, provided that "the said railroad company further agrees to grant the said telegraph company, as far as it has the right and power so to do, the exclusive right of way, for telegraphic purposes, on and along the line of its road, and will not permit any other person or corporation to construct a line or lines of telegraph along said railroad," was and is ineffectual, as against the congressional grant to the Atlantic & Pacific Railroad Company.

The ninth clause of the contract of June 1, 1872, further provided, "Nor in any case will it [the Atlantic & Pacific Railroad Company] furnish to such other person or corporation facilities, aid, or assistance in constructing or maintaining such competing lines, which it may lawfully withhold." The contention of the Western Union Telegraph Company is that the Atlantic & Pacific Railroad Company

can lawfully withhold all of the facilities asked for by the Postal Telegraph Cable Company, and it is upon that construction of the contract that the receivers deny to the Postal Company the facilities in question. I am of the opinion that it did not lie in the power of the Atlantic & Pacific Railroad Company to contract that it would not furnish to any other person or corporation than the Western Union Telegraph Company facilities, aid, or assistance in constructing or maintaining a line or lines of telegraph which might compete with the Western Union Telegraph Company. The Atlantic & Pacific Railroad Company was not incorporated for any such purpose. That company derived its existence from the act of congress of July 27, 1866, entitled "An act granting lands to aid in the construction of a railroad and telegraph line from the states of Missouri and Arkansas to the Pacific coast." 14 Stat. 292. By that act the Atlantic & Pacific Railroad Company was incorporated, and authorized and empowered to lay out, locate, and construct, furnish, maintain, and enjoy, a continuous railroad and telegraph line, with the appurtenances, "Beginning at or near the town of Springfield, in the state of Missouri, thence to the western boundary line of said state, and thence, by the most eligible railroad route, as shall be determined by said company, to a point on the Canadian river; thence to the town of Albuquerque, on the river Del Norté, and thence, by way of the Aqua Frio, or other suitable pass, to the headwaters of the Colorado Chiquito, and thence along the 35th parallel of latitude, as near as may be found most suitable for a railway route, to the Colorado river at such point as may be selected by such railroad company for crossing, thence by the most practicable and eligible route, to the Pacific" ocean. The eleventh section of the act provided that the company so incorporated shall be a post route and military road subject to the use of the United States for postal, military, naval, and all other government service, and also subject to such regulations as congress may impose restricting the charges for such government transportation. And by the twentieth section of the act it was provided "that, the better to accomplish the object of this act, namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times, but particularly in time of war, the use and benefits of the same for postal, military, and other purposes, congress may at any time, having due regard for the rights of said Atlantic & Pacific Railroad Company, add to, alter, amend, or repeal this act." The Atlantic & Pacific Railroad Company was thus created, and made a great highway of communication, with the declared object of promoting the public interest and welfare. There is not a syllable in the act indicating that it was intended by congress to be used as an instrument for the building up or fostering of any monopoly of any character, or that it should be permitted to do any act inconsistent with the objects for which it was created. If it may lawfully withhold facilities for the transportation of material and supplies for the erection of a line or lines of telegraph which

may come into competition with some other line, no reason is perceived why it may not also withhold facilities for the transportation of any other kind of freight in the interest of some one or more favored persons or corporations. The Atlantic & Pacific Railroad Company is a common carrier, and common carriage must be kept open to all alike, under like circumstances and conditions. What the considerations were that induced the Atlantic & Pacific Company to make the stipulation in question is immaterial. Its purpose plainly was to prevent competition. In the present age of progress the telegraph is as essential to the needs and comforts of the public as the railroads themselves. "Telegraphs," said Mr. Wharton in a note to the case of W. U. Tel. Co. v. Burlington & S. Ry. Co., 11 Fed. 12, "are now essential to business, and, as such, are to be kept open to competition, unless the legislature should otherwise determine, in the same way that common carriage is to be kept open to competition. Any agreement to give a particular line of carriers monopoly in a state would not, without legislative aid, be enforced, nor should a contract to give a monopoly to a particular telegraph company." The Atlantic & Pacific Railroad Company, being a common carrier, is bound to afford every telegraph company, as well as every other company or person, equal transportation facilities under like circumstances and conditions; and its agreement to withhold from any other company or person than the Western Union Telegraph Company such facilities is, in my opinion, at variance with the declared purposes for which that company was created, against public policy, in restraint of trade, and void.

It was stated by counsel for the receivers, in open court, that but for the provisions of the contract of June 1, 1872, to which reference has been made, they would afford the facilities asked for by the Postal Telegraph Cable Company, namely, the distribution of the necessary material between the regular stations, and the furnishing of water to the force engaged in the construction of that line. The evidence shows, what is also judicially known to the court, that the right of way of the Atlantic & Pacific Company between the Needles and Mojave is over a desert country, and that the railroad company, through the receivers, has possession and control of all the available water supply upon and along the right of way. Evidence was also given to the effect that it is customary for the railroad company to furnish miners and others parties at and between their stations with water for their necessities, upon compensation paid therefor, and that the poles and other material can be distributed, and water furnished to the petitioner, without any inconvenience, and in accordance with the usual and ordinary method of transacting the business of the railroad between the Needles and Mojave. That being so, and there being no valid contract preventing it, there can certainly be no valid reason why the receivers should not distribute the poles and other material between stations, for a just compensation. It is in evidence, and is also a matter of common knowledge, that the erection of another line of telegraph along the right of way in question will be a direct

benefit to the railroad company, in that it will increase its telegraphic facilities, especially in case of accident to or other interruption of the lines of the Western Union Company. In respect to water, if the company has any to spare, I do not see that the furnishing of it to those in need along its line can be objected to by any one,—certainly, not by one who has no interest therein. The furnishing of water, under the circumstances appearing, is not inconsistent with any of the purposes for which the Atlantic & Pacific Railroad Company was created; and, if those administering the property can earn something thereby for the owners of the property, there is no good reason why they should not do so. An order will be entered directing the receivers to afford the facilities asked for by the petition, upon just compensation.