**UNITED STATES v. DRUMB et al.**
No. 3146.

Circuit Court of Appeals, Tenth Circuit.

Jan. 4, 1946.

Rehearing Denied Feb. 7, 1946.

George S. Swarth, of Washington, D. C. (J. Edward Williams, of Washington, D. C., Cleon A. Summers, of Muskogee, Okl., and Roger P. Marquis, of Washington, D. C., on the brief), for appellant.

W. J. Hulsey and H. I. Aston, both of McAlester, Okl. (Lena Hulsey, of McAlester, Okl., on the brief), for appellees.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

This action was brought by the United States on its own behalf and for the benefit of the Choctaw and Chickasaw Tribes of Indians to quiet title in the Tribes to certain lands in the City of McAlester, Oklahoma, on the ground that such lands had reverted to those tribes when they were abandoned for railroad purposes.

The land which is the subject of this controversy consists of two city blocks which at one time had been set aside for railroad station, siding, and railroad yard purposes in the City of McAlester. It was a part of a large area of land originally ceded to the Choctaw Tribe by the United States under the Treaties of 1820 and 1830, 7 Stat. 210, 333. The Chickasaw Tribe acquired rights in these lands by the Treaty of Jan. 17, 1837, 11 Stat. 573. By the Treaty of April 28, 1866, 14 Stat. 769, the Tribes granted a right of way through their lands to any companies authorized by Congress to construct a railroad. Section 6 of the Act of July 25, 1866, 14 Stat. 236, provided for a right of way for the Kansas and Neosho Valley Railroad Company across the public domain. Section 8 of the Act authorized the company to construct its road through the Indian Territory and provided for a right of way wherever necessary, to the same extent as granted by Section 6 through the public lands. Section 11 provided that of the three named companies, the one which first completed its road to the southern boundary of Kansas should be authorized to construct its road through the Indian Territory. The Union Pacific, southern branch, now the Missouri-Kansas-Texas

Railroad Company, first qualified and obtained the right of way. The Secretary of the Interior approved the grant of right of way in question, subject to individual rights of Indians.

The company never used the right of way tract in question. On October 25, 1904, it quitclaimed various parts of the land embraced therein to individuals, corporations, and the City of McAlester, who were occupying portions thereof, in consideration for deeds to other tracts of land on the opposite side of the railroad, deemed to be more suitable for right of way purposes. The city divided the lands into lots and blocks and quitclaimed all the lots, with the exception of Lot 9 in Block 85a, to the occupants thereof.

The theory of the government is that when the railroad abandoned the tract, it reverted, and the title thereto became vested absolutely in the Indian Tribes. Trial was had to the court. The court held: (1) That the grant vested the full fee title to the tract in the railroad company, and that the abandonment did not effect a reverter; (2) that the statute of limitations had run; (3) that the Act of April 26, 1906, 34 Stat. 137, Section 14, vested title in the City of McAlester; (4) that the railroad company did not abandon the tract because it acquired land on the other side of the tracks for railroad purposes, thereby effecting an exchange of properties. We cannot agree with the trial court's conclusions Numbers 1, 2, and 4, but since we agree with the trial court's conclusion Number 3, it would serve no useful purpose to recite in detail the reasons why we do not agree with the other conclusions of the court, and would only unduly and unnecessarily extend and encumber this opinion.

The title of the Act of April 26, 1906, is "An Act To provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory, and for other purposes." Section 14 of the Act provides in part that the lands of Indians which had been reserved from allotment or sale under the Act of Congress for the use or benefit of any corporation or organization should be conveyed to such person or corporation upon condition that if any such tract before conveyance thereof should be abandoned for the use for which it was reserved by the party in whose interest the reservation was made, such tract or parcel should revert to the Tribe and

be disposed of as other surplus lands thereof. It exempted from the operation of this part of the provision railroad rights of way. The section provided that if any railroad right of way should cease to be used for the purposes for which it was reserved, title thereto should thereupon vest in the owner of the legal subdivision of which the land so abandoned was a part, except lands within a municipality, the title to which, upon abandonment, should vest in such municipality.

In United States v. Magnolia Petroleum Co., 10 Cir., 110 F.2d 212, our court construed the Act of 1906 as it applied to abandoned railroad rights of way. In that case a railroad company which obtained a right of way merely filed a map of location. It never constructed the road nor paid any compensation for damages resulting from its right of way. The government there, as here, instituted an action to quiet title to the right of way in itself and for the benefit of the Indian Tribes on exactly the same theory that it advances here. We held that the purpose of Congress in enacting Section 14 was to avoid the evils which would arise from the retention in the Tribe as remote dedicators of the strips or small tracts reserved for right of way purposes for railroad use. It was held that the purpose of Section 14 was to bring to a final conclusion the affairs of the Tribes—in other words, to wind up and dispose completely of. Tribal ownership of lands. We said that to hold that the abandonment of a right of way of a railroad would reinvest the title thereto in the Tribe would' be inconsistent with the general purpose and intent of the statute as a whole, and would be out of harmony with the manifest purpose of Section 14 to completely wind up the Tribe's interest in all real estate not separately allotted to individual Indians.

The government contends that Section 14 is not applicable here because this right of way was abandoned in 1904, prior to the passage of the Act of 1906, and that the Act applies only to abandonments occurring thereafter. Under such a construction the Act would accomplish only a part of the broad general policy enunciated therein. In the Magnolia case, supra, the right of way likewise had been abandoned prior to the passage of the Act of 1906. The Act under which the right of way was there granted provided that the railroad must be completed within three and one-half years, otherwise the grant was vacated. The map of location was recorded in October, 1902. The opinion points out that nothing whatever was done thereafter. More than three and a half years therefore intervened between the filing of the map of location and the passage of the Act of 1906, so that when the Act was passed the railroad right of way already had been lost. While our court did not specifically advert to this fact, we think it is apparent that it had this fact in mind. At page 218 of the opinion, it is stated: "But it is urged that the statute has no application here for the reason that the company merely filed a map of location, that it never paid any compensation or went into possession of the land, and that it never acquired a right-of-way."

Continuing, the opinion states: "By its clear terms the statute is not confined to instances in which the company had a ripened easement for right-of-way purposes. Congress saw fit not to limit it to cases of that kind."

 Congress had the power to make a disposal of these contingent reversionary interests in railroad rights of way, not only of those which might be abandoned subsequent to the passage of the Act, but also of those where abandonment had occurred prior thereto. In Missouri K. & T. R. Co. v. Roberts, 152 U.S. 114, 14 S.Ct. 496, 497, 38 L.Ed. 377, the Supreme Court points out that while the rights of Indians to their tribal lands arose by treaty, presumably between two sovereign people, as a matter of fact the superior rights to these lands were in the United States for the benefit of the Indians, with power in the government to make such disposal thereof as it saw fit. The court states: "Though the law as stated, with reference to the power of the government to determine the right of occupancy of the Indians to their lands, has always been recognized, it is to be presumed, as stated by this court in the Buttz case [Buttz v. Northern Pac. Railroad Co., 119 U.S. 55, 7 S.Ct. 100, 30 L.Ed. 330], that in its exercise the United States will be governed by such considerations of justice as will control a Christian people in their treatment of an ignorant and dependent race, the court observing, however, that the propriety or justice of their action towards the Indians, with respect to their lands, is a question of governmental policy * * *."

The purpose of Section 14 of the Act of 1906 was to make final disposition of the Tribes' reversionary interest in these narrow strips of land included in railroad rights of way. It is broad enough in its scope to include abandonments accruing prior to the passage of the Act, as well as to those accruing thereafter. To limit it to abandonments occurring after the passage of the Act would be inconsistent with the general purpose of the statute as a whole and would defeat the manifest purpose of Congress to wind up the affairs of the Tribe as a unit and to completely divest it of title to any lands or interest therein.

■■ There is yet another reason why the government cannot prevail. It is a general principle of law, adhered to without exception, that when a railroad right of way easement is abandoned, the tract reverts by operation of law and becomes a part of the abutting or adjoining property.[1] The government could, of course, refuse to recognize this principle of law in its handling of Indian lands. There is, however, nothing in any of the acts of Congress out of which this right of way arose which evidences an intent on the part of Congress that this rule of law should not apply to such lands. In the absence of some contrary intimation in some of the acts of Congress dealing with Indian lands, we think the presumption must be that Congress intended that the general rule should apply. Under this rule, upon abandonment of a right of way while the adjoining land was in the Tribe, the strip of land would revert to the abutting property and belong to the Tribe. If in the meantime the Tribe had disposed of the land, it would follow the land. The application of the general rule is in harmony with the declared policy of Congress in passing the Act of 1906, to completely liquidate and dispose of all tribal lands.

Furthermore, we think the Act of 1906 evidences Congressional recognition of the general rule. The Act recognizes two classes of easements—those held by persons, associations and corporations, and railroad rights of way. The former no doubt were occupied by churches, stores, schoolhouses and other buildings. They no doubt consisted of larger tracts, which possessed general utility and had substantial value as separate tracts. The law of reverter would not apply to such tracts. Congress recognized this, but nevertheless wanted to divest the Tribe of the reversionary interest in such tracts. The Act therefore provided that the reversionary estate therein should be conveyed to the holder of the dominant estate. No consideration was exacted for such conveyance. When Congress considered the reversionary interest in railroad rights of way, it recognized the general rule of reverter and accordingly provided that such estates should pass under the general law, with the exception that in cities the right of way should revert to the city.

■ It follows that even if the Act of 1906 should be held not to apply to abandonments prior thereto, the right of way in question would revert to the abutting property under the general law of reverter, and the Tribe accordingly would have no interest therein. That this might constitute a flaw in appellee's title is no aid to the government. It must prevail on the strength of the Indians' title, and not upon any weakness in that of the appellees.

The judgment of the trial court is therefore affirmed.

[1] City of Stillwater v. Hamilton, 112 Okl. 10, 239 P. 897; Roxana Petroleum Corp. v. Sutter, 8 Cir., 28 F.2d 159; Bowers v. Atchison, T. & S. F. R. Co., 119 Kan. 202, 237 P. 913, 42 A.L.R. 228; Paine v. Consumers Forwarding & Storage Co., 6 Cir., 71 F. 626.