CHOCTAW NATION and Chickasaw
Nation, Appellants,

v.

The ATCHISON, TOPEKA AND SANTA
FE RAILWAY COMPANY, and Davy
C. Maner, Appellees.

No. 9572.

United States Court of Appeals
Tenth Circuit.

March 6, 1968.

Lon Kile, Hugo, Okl., for appellants.

Streeter B. Flynn, Oklahoma City, Okl. (Dan M. Welch, of Rainey, Flynn, Welch, Wallace, Ross & Cooper, Oklahoma City, Okl., on the brief), for appellees.

Before PICKETT, LEWIS and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Appellants-plaintiffs Choctaw Nation and Chickasaw Nation, two Indian tribes, brought suit to secure possession of, quiet title to, and recover a reasonable rental for a tract of about 200 acres formerly reserved from allotment because of an easement acquired by a predecessor of the appellee, The Atchison, Topeka and Santa Fe Railway Company. The district court sustained a motion to dismiss and this appeal followed.

By virtue of the 1820 Treaty of Doaks Stand [1] and the 1830 Treaty of Dancing Rabbit Creek,[2] the Choctaw Nation acquired from the United States in fee simple a large area of land in what is now the State of Oklahoma. The Chickasaw Nation later secured a one-fourth interest in the area which embraces the land in suit.[3] The grants were to the tribes. Individual Indians had no title or enforceable right in tribal property.[4] Intolerable situations developed [5] and resulted in the appointment of the Dawes Commission to negotiate with the tribes for the extinguishment of their titles.[6] This Commission and the Choctaw and Chickasaw representatives made what is known as the Atoka Agreement which was incorporated into the Curtis Act, 30 Stat. 505, and later supplemented by a 1902 act, 32 Stat. 641, 657. This agreement provided, among other things, for the allotment of the lands to individual Indians.

The Enid and Anadarko Act of 1902 [7] provided for the acquisition of railroad rights-of-way across these Indian lands and authorized the acquisition of easements by condemnation. Section 14 of that Act [8] provides in part:

"And when necessary for a good and sufficient water supply in the operation of any railroad, any such railway company shall have the right to take

---

1. 7 Stat. 210.

2. 7 Stat. 333.

3. See Chickasaw Nation v. United States, 94 Ct.Cl. 215, 237.

4. Choate v. Trapp, 224 U.S. 665, 671, 32 S.Ct. 565, 56 L.Ed. 941.

5. Stephens v. Cherokee Nation, 174 U.S. 445, 450–460, 19 S.Ct. 722, 43 L.Ed. 1041, contains an account of conditions existing in the tribal governments and refers to their corruption and irresponsibility. In Choate v. Trapp, 224 U.S. 665, 667, 32 S.Ct. 565, reference is made to the fact that the existence of an extensive area wherein private property was not recognized was a serious obstacle to the creation of the State of Oklahoma.

6. 27 Stat. 612, 645.

7. 32 Stat. 43.

8. 32 Stat. 47.

and condemn additional lands for reservoirs for water stations, and for such purpose shall have the right to impound surface water or build dams across any creek, draw, canyon, or stream, and shall have the right to connect the same by pipe line with the railroad and take the necessary grounds for such purposes * * *."

Pursuant to this provision a predecessor of the Santa Fe acquired the land in question for reservoir purposes in 1903. The use was abandoned in 1910.

In 1906, Congress passed an act [9] to "provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory." The Choctaws and Chickasaws are two of the Five Civilized Tribes. Section 14 [10] of this Act says that lands reserved from allotment or sale under any act of Congress for the benefit of any person, corporation, or association shall be conveyed to the one entitled thereto. This is followed by two provisos. The first reads that if any reserved parcel has been abandoned before conveyance it "shall revert to the tribe and be disposed of as other surplus lands thereof." The second proviso is that railroad easements for "right of way, depot, station grounds, water stations, stock yards or other uses" may be acquired under regulations of the Secretary of the Interior and, if not so acquired and when the railroad ceases to use it for the reserved purpose, "shall thereupon vest in the owner of the legal subdivision of which the land so abandoned is a part" except when the land is within a municipality.[11] The railroad did not acquire fee title to the land in dispute. The land is not located within a municipality. Under the second proviso title, free of the easement, vests in the abutting landowner upon abandonment of the easement.

We have repeatedly given effect to the second proviso and upheld the vesture of rights in accordance therewith. In United States v. Magnolia Petroleum Co., 10 Cir., 110 F.2d 212, the history of the legislation with which we are concerned was reviewed and the vesture of railroad right-of-way in abutting landowners was upheld as against the claim asserted by the United States on behalf of the Indians that upon abandonment title passed to the Indian tribes. In United States v. Drumb, 10 Cir., 152 F.2d 821, another case concerning the Choctaws and Chickasaws, the court said: "Congress had the power to make a disposal of these contingent reversionary interests in railroad rights of way * * *." The principles announced in Magnolia and Drumb have been followed in seven other cases.[12]

The tribes say that the second proviso takes their lands without compensation in violation of the Fifth Amendment. The argument is that the tribes had fee title; that in the condemnation proceedings under the Enid and Anadarko Act whereby the railroad obtained its right, they were compensated only for the easement; and that the vesture of title in the abutting landowner takes their fee without payment.

The above mentioned Tenth Circuit decisions which recognized the validity of the 1906 Act and particularly the validity of the second proviso [13] are attacked on the ground that they miscon-

9. 34 Stat. 137.

10. 34 Stat. 142.

11. These statutory provisions are herein referred to as the second proviso.

12. See Seminole Nation v. White, 10 Cir., 224 F.2d 173, cert. denied 350 U.S. 895, 76 S.Ct. 153, 100 L.Ed. 787; Chickasha Cotton Oil Co. v. Town of Maysville, 10 Cir., 249 F.2d 542; St. Louis-San Francisco Ry. v. Town of Francis, 10 Cir., 249 F.2d 546; City of Wilburton v. Swafford, 10 Cir., 253 F.2d 479; Town of Maysville v. Magnolia Petroleum Co., 10 Cir., 272 F.2d 806; Fitzgerald v. City of Ardmore, 10 Cir., 281 F.2d 717; and St. Louis-San Francisco Ry. v. Walter, 10 Cir., 305 F.2d 90.

13. See particularly United States v. Drumb, 10 Cir., 152 F.2d 821, 823–824.

ceived the holdings in Missouri, K. & T. Ry. v. Roberts, 152 U.S. 114, 14 S.Ct. 496, 38 L.Ed. 377, and Buttz v. Northern Pac. R. R., 119 U.S. 55, 7 S.Ct. 100, 30 L.Ed. 330 because those two cases related to situations where the Indians had only a right to possession and the fee was in the United States. In the cases with which this court has been concerned, and here, the fee is in the Indians by virtue of the Treaty of Dancing Rabbit Creek.[14] We see no validity in the distinction. In Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 281, 75 S.Ct. 313, 318, 99 L.Ed. 314, an aboriginal possession case, the Court said that: "No case in this Court has ever held that taking of Indian title or use by Congress required compensation."

■ Each of these tribes "was a dependent Indian community under the guardianship of the United States, and therefore its property and affairs were subject to the control and management of that government."[15] In Choctaw Nation v. United States, 119 U.S. 1, 27, 7 S.Ct. 75, 90, 30 L.Ed. 306, the Court, quoting from an earlier decision, said: "These Indian tribes *are* the wards of the nation; they are communities *dependent* on the United States * * *." In exercising control and management, the United States must act in good faith and in the best interests of its wards.[16]

■ In making final disposition of the affairs of the tribes, Congress was faced with the problem of the vesture of title upon the abandonment of an easement. It determined that title should vest in the abutting landowners. These landowners were either Indian allottees or their successors in title. Such disposition was neither unfair to the Indians

nor contrary to their best interests. The contingent right went to the individual Indians or those who held under them. The United States as guardian did not benefit from the results of abandonment.

■ The Indians say further that the intent of the second proviso was to dispose only of narrow strips and gores and not to dispose of larger tracts such as we have here. The argument runs contrary to the language of the statutes. The Enid and Anadarko Act permitted the railroads to acquire lands for reservoirs and water stations. The second proviso covers easements for a number of uses including "water stations" and "other uses." Reservoirs are not excluded from its terms. In fact, the second proviso says nothing about the size of the easement taken. We take it that Congress intended to include all railroad easements.

■ This is not a suit against the United States for any breach of a fiducial duty. Instead, it is a suit to oust those who hold pursuant to a statute of the United States. The specific attack is on the second proviso but the second proviso is an integral part of the statute making final disposition of the affairs of the tribes. It cannot be separated because to do so "would be inconsistent with the purpose and intent of the statute as a whole."[17] The United States in its sovereign capacity had the power to make final disposition of the lands and in so doing did not breach any duty owed by it to the Indians. A nullification of the second proviso on the Fifth Amendment ground here asserted would be a substantial detriment to the Indian allottees and their successors in interest.[18]

14. 7 Stat. 333, Art. II.

15. United States v. Creek Nation, 295 U.S. 103, 109, 55 S.Ct. 681, 684, 79 L.Ed. 1331.

16. Shoshone Tribe of Indians of Wind River Reservation in Wyoming v. United

States, 299 U.S. 476, 497, 57 S.Ct. 244, 81 L.Ed. 360.

17. United States v. Magnolia Petroleum Co., 10 Cir., 110 F.2d 212, 218.

18. The pertinent cases heretofore litigated in this court show that substantial eco-

The efforts of Congress to effectuate the principles of the Atoka Agreement [19] would be severely affected.

Affirmed.

---

nomic values would be affected. See the cases cited in note 12.

19. See 30 Stat. 505 and 32 Stat. 641, 657.