641 F.2d 856
 MISSOURI-KANSAS-TEXAS RAILROAD COMPANY, a corporation,
Plaintiff-Appellee,
v.
Harmon A. EARLY, Betty Early, Nancy Early, Gail Early, A.
Henton, J. N. Allen, Jr., Rena Mai Allen, Bessie Shirley
Lemons, Guy A. Deem, Betty Lee Deem, William H. Haworth,
Jr., Garlene Vandever Haworth, John A. Haworth, Jane
Haworth, Rosa Bean, individually and as Administratrix of
the Estate of Gertrude Jones, deceased, A. Camp Bonds, Earl
Youree, Beulah Cornine Yochum, Eugene Clough, Oscar Jones,
Madeline Jones, and First National Bank and Trust Company of
Tulsa, Oklahoma, a national banking association,
Defendants-Appellants.
 No. 79-1070.
 United States Court of Appeals,
Tenth Circuit.
 Argued Sept. 17, 1980.
Decided Feb. 20, 1981.
 
 1
 A. Carl Robinson of Robinson, Locke & Gage, Muskogee, Okl., for defendants-appellants.
 
 
 2
 William C. Anderson of Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, Okl. (Dallas E. Ferguson, Tulsa, Okl., of the firm, and Joe C. Crawford, General Sol., Dallas, Tex., on the brief), for plaintiff-appellee.
 
 
 3
 Before McWILLIAMS and BARRETT, Circuit Judges, and BOHANON, District Judge*.
 
 
 4
 BOHANON, District Judge.
 
 
 5
 During construction of the Arkansas-Verdigris River Navigation System in eastern Oklahoma in the late 1960's, the United States Corps of Engineers found it necessary to raise numerous bridges crossing the navigation channel. In order to limit the number of bridges to be constructed, the M-K-T Railroad and the Kansas, Oklahoma, and Gulf Railway agreed to relocate and consolidate their approaches to the channel, so as to necessitate the construction of only one new bridge. The land which constitutes the subject matter of this action is the strip over which the M-K-T's track ran to the river before the rerouting.
 
 
 6
 Due to continuing encroachments by abutting landowners, the plaintiff-appellee railroad brought this action to quiet title. The defendant-landowners crossclaimed, alleging that the railroad had acquired, at best, an interest in the nature of an easement, subsequently abandoned, thereby causing ownership to vest in the owners of the abutting property.
 
 
 7
 After the parties' briefing and oral argument, the trial court rendered judgment for the railroad, finding that certain Acts of Congress, treaties and the applicable caselaw, described hereafter, vested fee simple absolute title in the railroad.
 
 
 8
 The landowners appealed, wishing this court to find as a matter of law that the railroads had never acquired a fee simple interest, and thereafter to remand to the trial court on the issue of abandonment. We find the trial court's conclusions to be correct and therefore affirm.
 
 
 9
 Our resolution of this case demands it be reviewed from a historical prespective. It has long been established that "Courts, in construing a statute, may with propriety recur to the history of the times when it was passed." United States v. Union Pac. R.R., 91 U.S. 72, 79, 23 L.Ed. 224 (1875).
 
 
 10
 On February 14, 1833, a treaty was concluded between the government and the Creek, or Muskogee, Tribe of Indians (hereafter, Creek). The treaty granted the Creeks certain lands in fee, including those here in question.
 
 Article III of the treaty states:
 
 11
 "The United States will grant a patent in fee simple to the Creek Nation for the land assigned said Nation by this treaty or convention, whenever the same shall have been ratified by the President and Senate of the United States, and the right thus guaranteed by the United States shall be continued to said tribe of Indians so long as they shall exist as a nation and continue to occupy the country hereby assigned them."
 
 
 12
 The treaty received presidential approval, and letters patent were issued August 11, 1852.
 
 
 13
 The following years saw the settlement of the West to become a national imperative. Recognizing the necessity of an extensive railway system to link the agricultural outlands to the period's marketplaces, Congress passed a number of land grant statutes. Railroads were awarded vast western acreages as inducements for, and in payment of, the construction of railroad networks through the wilderness. The land in question in this case consisted of a strip some 200 feet wide and upon which the railroad track was laid.
 
 
 14
 On July 19, 1866, Congress ratified a treaty negotiated between the Creek Nation and the United States. 14 Stat. 785. Article V of the treaty granted a right of way through their lands, the lands granted them by the patent dated August 11, 1852. The treaty states:
 
 
 15
 "The Creek nation hereby grant a right of way through their lands ... to any company which shall ... undertake to construct a railroad from any point north of to any point in or south of the Creek country...."
 
 
 16
 at 787.
 
 
 17
 Additionally, in Article V the Creeks agreed to sell certain lands:
 
 
 18
 "... and the Creeks agree to sell to the United States, or any company duly authorized as aforesaid, such lands not legally owned or occupied by a member or members of the Creek nation, lying along the line of said contemplated railroad, not exceeding on each side thereof a belt or strip of land three miles in width...."
 
 
 19
 at 787.
 
 
 20
 Two separate Acts of Congress govern the vesting of title to this strip:
 
 
 21
 (a) The Act of July 25, 1866, 14 Stat. 236.
 
 
 22
 Congressional authorization for certain rights of way through the Creek lands soon followed. In 1866, three railroads were building lines within the State of Kansas. The Act of July 25, 1866, 14 Stat. 236, provided an incentive for each to quickly finish their tasks and tie in the lines to a point near the southern boundary of Kansas. Though the Act dealt primarily with the construction of certain rail lines by the Kansas and Neosho Valley Railroad Company in Kansas, Section 11 of the Act awarded the right to build a track from southern Kansas through Indian Territory; to link up with a line near Preston, Texas. The Act awarded this right to the first of the three railroads completing its work in Kansas.
 
 
 23
 The winner of this competition was a predecessor of the M-K-T, known as the Union Pacific Railroad Company, Southern Branch (hereafter, Union Pacific). The grants of land inuring to Union Pacific were governed by Section 8 of the Act:
 
 
 24
 "... and the right of way through the Indian Territory, wherever such right is now reserved or may hereafter be reserved to the United States by treaty with the Indian tribes, is hereby granted to said company, to the same extent as granted by the sixth section of this act through the public lands;"
 
 
 25
 The relevant language of Section 6 of the Act grants the railroad certain lands as follows:
 
 
 26
 "... the right of way through the public lands be, and the same is hereby, granted to said Kansas and Neosho Valley Railroad Company, its successors and assigns.... Said way is granted to said railway to the extent of one hundred feet in width on each side of said road where it may pass through the public domain...."
 
 
 27
 While the sections specifically mention the Kansas and Neosho Valley Railroad Company, the provisions of Section 6 also apply to the Union Pacific in its construction of a line through Indian Territory, and thus Creek territory, by the provisions of Sections 11 and 8.
 
 
 28
 (b) The Act of July 26, 1866, 14 Stat. 289.
 
 
 29
 A similar land grant procedure was utilized to expedite the construction of a railroad line from the Kansas border to Fort Smith, Arkansas. This Act of July 26, 1866, 14 Stat. 289, pertains specifically to the M-K-T's predecessor, the Union Pacific, and involves grants of land in both Kansas and the Indian Territory. Section 6 of the July 26 Act provides for the following:
 
 
 30
 "That the right of way through the public lands be, and the same is hereby, granted.... Said way is granted to said railroad to the extent of one hundred feet in width on each side of said road where it may pass through the public domain...."
 
 
 31
 at 290.
 
 
 32
 Both Acts, that of July 25, 1866, and that of July 26, 1866, cover the strip of land at issue, since the land is located north of the point where the Fort Smith connection breaks off the north-south main line and starts eastward. Otherwise stated, this piece of line served traffic heading south from Kansas and destined for either Fort Smith, Arkansas, or Preston, Texas.
 
 
 33
 The appellants' argument is basically this: The patent granted to the Creeks by the United States, dated August 11, 1852, vested in the tribe title to the lands in fee. The treaty of June 14, 1866, merely permitted the government to grant a "right of way," in the nature of the easement, across the Creek lands, and not any fee right, with divestiture of the fee arising from a sale only. The railroad never purchased the right of way.[1] Thus, the appellants claim that the interest of the railroad is, at best, an easement. The appellants further argue that the easement having been abandoned, the interest of the railroad is extinguished and the entire title and estate vested in the owner of the abutting legal subdivision or tract.[2]
 
 
 34
 In the appellants' words:"... the United States could not grant a right-of-way across the Indian lands because it had no ownership of any kind whatever in the Indian lands. It could only authorize a railroad company to build a line from the Kansas border south to the Choctaw and Chickasaw Country and such railroad so authorized by Congress would then be the Grantee of a right-of-way from the Creek Nation."
 
 
 35
 We fail to find the appellants' argument compelling. In Great No. Ry. v. United States, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1942), Justice Murphy traces the evolution of the term "right of way," as applied to Congressional land grants. Before 1875, it was common for Congress to grant to the railroads fee interests, utilizing the term "right of way." The courts have consistently so construed the land grant statutes. New Mexico v. United States Trust Co., 172 U.S. 171, 19 S.Ct. 128, 43 L.Ed. 407 (1898); Railroad Co. v. Baldwin, 103 U.S. 426, 26 L.Ed. 578 (1880).
 
 
 36
 In two cases, the Supreme Court has construed the Act of July 26, 1866, to grant a fee interest in the railroad:
 
 
 37
 In Missouri, K. & T. Ry. v. Roberts, 152 U.S. 114, 14 S.Ct. 496, 38 L.Ed. 377 (1894), the plaintiff below, Roberts, brought an action against the successor to the Union Pacific, Southern Branch. Part and parcel of the Court's duty was the determination of the ownership of the fee. The Court held the "right of way" language in the Act of July 26, 1866, to vest the fee in the railroad.
 
 The Court stated:
 
 38
 "The United States had the right to authorize the construction of the (rail) road ... through the reservation of the Osage Indians, and to grant absolutely the fee of the two hundred feet as a right of way to the company. Though the lands of the Indians were reserved by treaty for their occupation, the fee was always under the control of the government; and when transferred, without reference to the possession of the lands and without designation of any use of them requiring the delivery of their possession, the transfer was subject to their right of occupancy; and the manner, time and conditions on which that right should be distinguished were matters for the determination of the government, and not for legal contestation in the courts between private parties." (bracketed material added)
 
 
 39
 at 116-117, 14 S.Ct. at 497.
 
 
 40
 In Missouri, K. & T. Ry. v. Oklahoma, 271 U.S. 303, 46 S.Ct. 517, 70 L.Ed. 957 (1926), the Court again considered the grant of a "right of way" to the railroad under the Act of July 26, 1866. The Court held that the railroad owned its right of way lands in fee, citing Roberts.
 
 
 41
 The appellants would diminish the precedential value of Roberts by noting that the Osage Nation was never specifically issued a patent. Rather, lands were reserved for the Tribe's mere "use and occupation." 7 Stat. 240. In the present case, the Creeks were clearly granted the fee.
 
 
 42
 We considered a similar argument in Choctaw Nation v. Atchison, T. & S.F. Ry., 396 F.2d 578 (10th Cir. 1968), and found no validity in the distinction. at 581.
 
 
 43
 Historically, the United States has been held to have broad discretion in its disposition of Indian lands. Beecher v. Wetherby, 95 U.S. 517, 24 L.Ed. 440 (1877) provided the standard by which dealings with the Indians are measured:
 
 
 44
 "... the United States would be governed by such considerations of justice as would control a Christian people in their treatment of an ignorant and dependent race."
 
 
 45
 at 525.
 
 As noted in Choctaw Nation, supra:
 
 46
 "Each of these tribes 'was a dependent Indian community under the guardianship of the United States, and therefore its property and affairs were subject to the control and management of that government.' In Choctaw Nation v. United States, 119 U.S. 1, 27, 7 S.Ct. 75, 90, 30 L.Ed. 306, the Court, quoting from an earlier decision, said: 'These Indian tribes are wards of the nation; they are communities dependent on the United States * * * ' In exercising control and management, the United States must act in good faith and in the best interests of its wards." (footnotes omitted).
 
 
 47
 at 581.
 
 
 48
 Such decisions have ultimately remained, however, matters of governmental policy. See: Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955); United States v. Tillamooks, 329 U.S. 40, 51 n.27, 67 S.Ct. 167, 172 n.27, 91 L.Ed. 29 (1946); United States v. Santa Fe Pacific R.R., 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941); Buttz v. Northern Pacific R.R., 119 U.S. 55, 7 S.Ct. 100, 30 L.Ed. 330 (1886); New Mexico v. Aamodt, 537 F.2d 1102 at 1113 (10th Cir. 1976) (Barrett, J. concurring in part and dissenting in part); United States v. Drumb, 152 F.2d 821 (10th Cir. 1946).
 
 
 49
 The interest granted the railroad by the Act of July 25, 1866, could be subject to differing interpretations. In the Treaty of July 19, 1866, the Creeks did grant a right of way in one section and agreed to sell the same lands in another. If the subject strip were covered only by this Act, our task would be more difficult. However, the Act of July 26, 1866, resolves any controversy. Roberts, supra, Oklahoma, supra, and Choctaw Nation, supra control our determination of this case. The Act of July 26, 1866, when viewed in the light of the times, clearly expresses the intent of Congress to grant to the railway a fee interest in the Indian lands. Any deficiency in the title arising from the circuitous language of the Act of July 25, 1866, would have been effectively remedied through application of the language of the Act passed the following day.
 
 
 50
 The judgment of the trial court is AFFIRMED.
 
 
 
 *
 Of the Northern, Eastern and Western Districts of Oklahoma, sitting by designation
 
 
 [1]
 The Act of April 26, 1906, 34 Stat. 142, made final disposition of the affairs of the Five Civilized Tribes, the Creeks included. The Secretary of the Interior promulgated regulations permitting certain parties, such as railroads, to purchase title to tracts then in their possession. The appellants would advance the proposition that the failure of the railroad to avail itself of this final opportunity to purchase the land is fatal to their claim. See: St. Louis-San Francisco Ry. v. Walter, 305 F.2d 90 (10th Cir. 1962); United States v. Magnolia Petroleum Co., 110 F.2d 212 (10th Cir. 1939)
 
 
 [2]
 "It is the general rule that the servient estate in a strip of land set apart for a railroad or highway right-of-way, or for a street, or a small area set apart for school, church, or other public purpose, passes with a conveyance of the fee to the abutting legal subdivision or tract out of which the strip or small area was carved even though no express provision to that effect is contained in the instrument of conveyance, and that on the abandonment of the strip or small area of the purpose for which it was set apart and dedicated the dominant estate becomes extinguished and the entire title and estate vests in the owner of such abutting legal subdivision or tract." United States v. Magnolia Petroleum, 110 F.2d 212 (10th Cir. 1939); Shell Petroleum Corporation v. Hollow, 70 F.2d 811 (10th Cir. 1934); Shell Petroleum Corporation v. Corn, 54 F.2d 766 (10th Cir. 1932)