## UNITED STATES et al. v. MAGNOLIA PETROLEUM CO. et al.

### No. 1856.

Circuit Court of Appeals, Tenth Circuit.

Nov. 8, 1939.

---

214

William R. Sherwood, of Washington, D. C., and William G. Stigler, of Stigler, Okl. (Charles E. Collett, Acting Asst. Atty. Gen., Cleon A. Summers, U. S. Atty., of Muskogee, Okl., Charles W. Leaphart, Sp. Asst. to Atty. Gen., and Thomas Harris and Robert Koerner, both of Washington, D. C., on the brief), for appellants.

Earl A. Brown, of Ardmore, Okl. (W. H. Francis, of Dallas, Tex., Blakeney, Wallace, Brown & Blakeney, of Oklahoma City, Okl., and Victor C. Mieher, of Tulsa, Okl., on the brief), for appellees.

Before LEWIS, BRATTON, and WILLIAMS, Circuit Judges.

BRATTON, Circuit Judge.

The United States, in its own behalf and for the use and benefit of the Choctaw and Chickasaw Tribes of Indians, instituted this suit against Magnolia Petroleum Company, Amerada Petroleum Corporation, Samedan Oil Corporation, Simpson-Fell Oil Company, and Simon Westheimer to quiet title to a strip of land formerly part of a proposed railroad right-of-way traversing lands of the tribes, and for an accounting for oil and gas extracted therefrom. The Choctaw and Chickasaw Tribes intervened, joined as parties plaintiff, and adopted the allegations contained in the bill of complaint. Issues were joined, and the cause was submitted on stipulated facts and the testimony of a single witness. No dispute of fact is presented. The questions for determination are questions of law.

Desiring to secure a right-of-way for railroad purposes between the towns of Asher, Oklahoma, and Wapanucka, in the Chickasaw Nation, the Choctaw and Chickasaw Railway Company in October, 1902, filed a map of definite location designating a strip of land one hundred feet in width, and such map was approved by the Secretary of the Interior in November. The lands traversed by such strip were afterwards allotted in severalty to members of the tribes, and patents issued by the principal chief of the Choctaw Nation and the governor of the Chickasaw Nation and approved by the Secretary of the Interior were delivered to the respective allottees. Each patent described the land by legal subdivision, less the amount embraced within the strip. To illustrate, one patent described the land conveyed in this language:

"The Northeast Quarter of the Southeast Quarter, less three and 7/100 (3.07) acres occupied as right-of-way of the Choctaw and Chickasaw Railway, and the Northwest Quarter of the Southeast Quar-

ter of the Southeast Quarter less one and 53/100 (1.53) acres occupied as right-of-way by the Choctaw and Chickasaw Railway, and the South Half of the Southeast Quarter of the Southeast Quarter, less one and 54/100 (1.54) acres, occupied as right-of-way by the Choctaw and Chickasaw Railway Company, of Section Twenty-one" and other lands "containing 133.49 acres."

The other patents were substantially identical except in respect to the land described by legal subdivision, and the amount deducted or excepted for right-of-way purposes. The map was on file at the time the lands were selected for allotment, at the time the allotments were made, and at the time the patents were issued. But the railroad company did not pay any compensation or damages, did not take any other steps toward the acquisition of the right-of-way, and did not construct the railroad. Instead, the proposed construction was abandoned without the company paying compensation or occupying any part of the land. Title to the various allotments out of which the strip in question was carved passed from the respective allottees to others. Defendants own separate oil and gas leases each covering a portion of such lands, such leases having been executed by successors in interest of the allottees. Defendants drilled oil and gas wells on the lands adjacent to and abutting the strip, have extracted and removed large quantities of oil and gas therefrom, and intend to drill other wells on such adjacent and abutting lands.

The court concluded that the filing of the map of definite location authorized the railroad company to acquire only an easement or right in the nature of an easement across the lands; that the allotting officials were without power or authority to reserve in the patents any interest in the lands patented other than that necessary to recognize and preserve the prior accrued rights of the railroad company; that the patents conveyed the entire interest in the servient estate; that the limiting words of exception or exclusion recognized only a dominant estate, if any existed; and that upon forfeiture by nonuse of the railroad company of its right to acquire easements, the outstanding dominant estate became extinguished and the entire fee simple title became vested in the owners of the servient estate—the patentees and their successors in interest. A decree was entered dismissing the bill, sustaining the leases of the defendants, and enjoining the Indian tribes from disturbing the defendants in the use and enjoyment of their rights under such leases. The United States and the tribes joined in the appeals.

We take up first section 14 of the Act of April 26, 1906, 34 Stat. 137, 142. In doing so it may be assumed without deciding that the allotting officials had authority to insert in the patents the provision relating to the land embraced in the strip. The background against which the statute was enacted and other provisions in the act itself may appropriately be taken into account in determining the scope and effect which the Congress intended the section should have. The Five Civilized Tribes owned for the common use of their members immense areas of land in the territory which became a part of the State of Oklahoma. Each tribe had a system of tribal government, including tribal courts which exercised jurisdiction of controversies arising among its members. In 1893 the Congress authorized the appointment of a commission to enter into negotiations with the several tribes for the allotment in severalty of their lands and for the extinguishment of their tribal governments, 27 Stat. 612, 645, § 16. The Dawes Commission was appointed and began its labors. In 1894 Congress made an appropriation for the purpose of surveying the lands of the five tribes, in conformity to the laws applicable to the public domain, 28 Stat. 286, 306. The commission stated in its report made in 1895 that all branches of the tribal governments had become corrupt, irresponsible and unworthy, and should be abolished. See Stephens v. Cherokee Nation, 174 U.S. 445, 453, 19 S.Ct. 722, 43 L.Ed. 1041. In 1896 Congress directed the commission to continue the authority already conferred upon it, to endeavor to accomplish the objects theretofore prescribed and make report from time to time, and to proceed at once to make up the roll of citizens and freedmen, 29 Stat. 321, 339. The commission and the Choctaw and Chickasaw Tribes, executed the Atoka Agreement in 1897, and it was ratified by the Act of June 28, 1898, 30 Stat. 495. It provided that all lands belonging to the tribes should be allotted to the members of such tribes in such manner as to give to each so far as possible a fair and equal share thereof, considering the character and fertility of the soil and the location and value of the lands; that as soon as

practicable after the completion of such allotments, the principal chief of the Choctaw Nation and the governor of the Chickasaw Nation should jointly execute under their hands and seals patents conveying the lands to the allottees; that the acceptance of a patent by the allottee should operate as an assent to the allotment and as a relinquishment of all his right, title and interest in other lands, except his interest in the proceeds of lands, coal and asphalt excepted from allotment. All lands set apart for townsites, and specific quantities for three academies, two institutes, two seminaries, an orphanage, churches, and other institutions were reserved and exempted from division. Some of the tracts reserved consisted of one hundred sixty acres each, some of eighty acres, and some were smaller. The Supplemental Agreement, executed in March, 1902, and ratified by the Act of July 1, 1902, 32 Stat. 641, provided that all lands belonging to the two tribes, except such as were therein reserved from allotment, should be appraised at their true value by the commission; that there should be allotted to each member of the tribes, as soon as practicable after the approval of his enrollment, land equal in value to three hundred twenty acres of average allotable land; that each member should at the time of the selection of his allotment designate as a homestead out of such allotment land equal in value to one hundred sixty acres; that for the purpose of making allotments and designating homesteads the forty acre or quarter-section subdivisions established by the Government survey might be dealt with as if further subdivided into four equal parts in the usual manner, thereby making the smallest legal subdivision ten acres—a quarter of a quarter of a quarter of a section; that allotment certificates should be conclusive evidence of the right of the allottee to the land described therein; that when allotments had been made and completed to all citizens of the tribes and freedmen, the residue lands not reserved or otherwise disposed of should be sold at public auction under rules and regulations and on terms to be prescribed by the Secretary of the Interior, and so much of the proceeds as might be necessary for equalizing allotments should be used for that purpose, and the balance should be paid into the Treasury of the United States to the credit of the tribes and distributed per capita as other funds of such tribes. Reservation was again made of all land for townsites, and of specific quantities for the enumerated institutions. And all land to which, at the date of the final ratification of the agreement, any railroad company should have under any treaty or act of Congress a vested right for right-of-way, depots, station grounds, water stations, stock yards, or similar uses connected with the maintenance and operation of the railroad was likewise reserved from allotment.

Section 13 of the Act of February 28, 1902, 32 Stat. 43, 47, provided that the right to locate, construct, own, equip, operate, use, and maintain a railway and telegraph and telephone line or lines into or through the Indian Territory, together with the right to take and condemn lands for rights-of-way, depot grounds, terminals, and other purposes, in or through any lands held by Indian tribes or which had been or might be thereafter allotted in severalty to any individual Indian was granted to any railway company organized under the laws of the United States or of any state which should comply with the provisions of the act. Section 15 provided that correct maps of the line of a proposed railroad in sections of twenty-five miles each, and of the lands taken under the act should be filed with the Department of the Interior, with the Indian Agent for Indian Territory, and with the principal chief or governor of the tribe or nation through which the line was located; and that before any railroad should be constructed or any lands taken or condemned full compensation for such right-of-way, or other lands taken for railroad purposes, should be made to the allottee or the tribe.

A United States court for the Indian Territory was created in 1889 with limited civil and criminal jurisdiction, 25 Stat. 783; the jurisdiction of the court was enlarged in 1890, 26 Stat. 81; the territory was divided into three separate districts and the jurisdiction further enlarged in 1895, 28 Stat. 693; and the appointment of an additional judge was authorized in 1897, 30 Stat. 62, 84.

The Act of April 26, 1906, supra, 34 Stat. 137, followed, positioned in this setting. Its title is to "provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory, and for other purposes." Sections 1 to 4, inclusive, deal with the finality of the rolls; section 5 is addressed to the issuance of patents and the title to lands upon the death of allottee; section 6 authorizes the remov--

al of the principal chief of the Choctaw, Cherokee, Creek, or Seminole Tribe, or the governor of the Chickasaw Tribe upon neglect or refusal to perform the duties devolving upon him; section 7 authorizes the Secretary of the Interior to reserve certain lands; section 8 provides for the custody and preservation of the records in the land offices in the Indian Territory, for the making of authentic copies of such records, and for their admissibility in evidence; section 9 authorizes the disbursement of certain funds, and provides that the Court of Claims shall hear and adjudicate certain claims; section 10 authorizes the Secretary of the Interior to assume control and direction of the schools of the tribes and to conduct such schools; section 11 provides that all revenues accruing to the tribes before or after dissolution of the tribal governments shall be paid to the Secretary of the Interior; section 12 authorizes the Secretary to sell certain lots in towns and provides that the proceeds shall be deposited in the Treasury of the United States as are other funds of the tribes; section 13 provides that all coal and asphalt lands whether leased or unleased shall be reserved from sale under the act until the existing leases for coal and asphalt lands shall have expired or until otherwise provided by law; and the material part of section 14 provides:

"That the lands in the Choctaw, Chickasaw, Cherokee, Creek, and Seminole nations reserved from allotment or sale under any Act of Congress for the use or benefit of any person, corporation, or organization shall be conveyed to the person, corporation, or organization entitled thereto: Provided, That if any tract or parcel thus reserved shall before conveyance thereof be abandoned for the use for which it was reserved by the party in whose interest the reservation was made, such tract or parcel shall revert to the tribe and be disposed of as other surplus lands thereof: Provided further, That this section shall not apply to land reserved from allotment because of the right of any railroad or railway company therein in the nature of an easement for right of way, depot, station grounds, water stations, stock yards or other uses connected with the maintenance and operation of such company's railroad, title to which tracts may be acquired by the railroad or railway company under rules and regulations to be prescribed by the Secretary of the Interior at a valuation to be determined by him; but if any such com-pany shall fail to make payment within the time prescribed by the regulations or shall cease to use such land for the purpose for which it was reserved, title thereto shall thereupon vest in the owner of the legal subdivision of which the land so abandoned is a part, except lands within a municipality the title to which, upon abandonment, shall vest in such municipality."

Section 15 authorizes the Secretary of the Interior to sell all buildings and furniture then or theretofore used for governmental, school and other tribal purposes; section 16 provides that when allotments provided in such act and other acts have been made to all members and freedmen of the tribes, the residue lands shall be sold; section 17 provides that when the unallotted lands and other property belonging to the tribes have been sold and the moneys arising from all sources have been paid into the Treasury to the credit of such tribes, respectively, and all just charges against such funds have been deducted, any remaining funds shall be distributed per capita to the members then living and the heirs of deceased members whose names appear on the rolls; and the remaining sections devote themselves to matters relating to the final disposition of the affairs of the tribes.

It is the general rule that the servient estate in a strip of land set apart for a railroad or highway right-of-way, or for a street, or a small area set apart for school, church, or other public purpose, passes with a conveyance of the fee to the abutting legal subdivision or tract out of which the strip or small area was carved even though no express provision to that effect is contained in the instrument of conveyance, and that on the abandonment of the strip or small area of the purpose for which it was set apart and dedicated the dominant estate becomes extinguished and the entire title and estate vests in the owner of such abutting legal subdivision or tract. Shell Petroleum Corporation v. Corn, 10 Cir., 54 F.2d 766; Shell Petroleum Corporation v. Hollow, 10 Cir., 70 F.2d 811; Roxana Petroleum Corporation v. Sutter, 10 Cir., 28 F.2d 159; Shell Petroleum Corporation v. Ward, 5 Cir., 100 F.2d 778; Bowers v. Atchison, T. & S. F. Ry. Co., 119 Kan. 202, 237 P. 913, 42 A.L.R. 228; Barker v. Lashbrook, 128 Kan. 595, 279 P. 12. In Paine v. Consumers' Forwarding & Storage Co., 6 Cir., 71 F. 626, 632, it was said: "The evils resulting from the retention in remote dedicators of the fee in gores and

strips, which for many years are valueless because of the public easement in them, and which then become valuable by reason of an abandonment of the public use, have led courts to strained constructions to include the fee of such gores and strips in deeds of the abutting lots. And modern decisions are even more radical in this regard than the older cases."

Congress enacted section 14 with that general rule in mind. The section treats with marked difference land reserved for an institutional use and abandoned for such purpose prior to conveyance, and land reserved for right-of-way or other railroad purpose. It first provides that where land has been reserved for an institutional use but abandoned for such purpose prior to conveyance, it shall revert to the tribe and be sold as other surplus lands. It then provides that it shall not apply to land reserved from allotment because of the right of a railroad company therein in the nature of an easement for right-of-way or other named railroad purposes, title to which the railroad company may acquire at a valuation to be fixed by the Secretary of the Interior, and that where such company shall fail to make payment within the permitted time or shall cease to use the land for the purpose for which it was reserved, title thereto shall vest in the owner of the legal 'subdivision out of which it was taken. And it further provides that where land reserved from allotment for railroad purposes is situated within a municipality, title thereto shall on abandonment vest in such municipality. In the first instance the land is to revert to the tribe, but in the second it is to vest in the owner of the legal subdivision out of which it was carved, and in the third it is to vest in the municipality. These distinctive provisions cannot be regarded as a mere coincident. They make clear a legislative intent that in the first instance title shall repose in the tribe but not in the other two. The statute is plainly a grant of land reserved from allotment for right-of-way or other railroad purpose to the owner of the legal subdivision out of which it was taken where the company has a right in the nature of an easement but fails to acquire legal title by payment within the permitted time or ceases to use the land for the purpose for which it ·was reserved. The purpose was to avoid the plain evils which would arise from the retention in the tribe as remote dedicator of a strip or other small tract reserved for right-of-way or other railroad use. That is the rationale of the

section, and it is in harmony with the legislative purpose of the entire act—to bring to final conclusion the affairs of the tribes. To say that on failure of a railroad company to make payment of a narrow strip reserved for a right-of-way or on its abandonment for such purpose, title rests in the tribe, would be inconsistent with the purpose and intent of the statute as a whole, would be out of harmony with the manifest purpose of section 14, and would be at variance with the rule against retention of title in remote dedicators. It would be an interpretation not warranted by the language or history of the section.

But it is urged that the statute has no application here for the reason that the company merely filed a map of location, that it never paid any compensation or went into possession of the land, and that it never acquired a right-of-way. The argument is that the mere filing of a map of location did not vest in the company a right-of-way or right in the nature of an easement. By its clear terms the statute is not confined to instances in which the company had a ripened easement for right-of-way purposes. Congress saw fit not to limit it to cases of that kind. Care was exercised to use language having a substantially broader· scope than that. The language is broad enough to include a case where the company acquired a right susceptible and capable of being matured or ripened into an easement. Here the company acquired a right of that kind on the filing of the map. It thereupon became vested with the contingent or inchoate right to acquire a right-of-way by making payment of compensation within the time allowed and otherwise complying with the authorized rules and regulations of the Secretary of the Interior. The allotting officials were without authority after the filing of the map to allot the land embraced within the strip. The strip was thereupon and in that manner appropriated to railroad purposes even though the appropriation was not complete, but was conditional and contingent. The company had such right in the nature of an easement as to bring the land within the statute.

The rule of administrative construction is invoked. It is said that the established administrative construction has been that the statute does not apply to land in a proposed right-of-way for which no compensation was paid to the tribes. The court found that from time to time some sixty-nine tracts of land of abandoned railroad

rights-of-way had been sold and conveyed by the Secretary of the Interior as lands of the two tribes; that about ten or twelve of such tracts were a portion of the land described in the map of definite location filed by the Choctaw and Chickasaw Railway Company, but that there had been no uniform holding by the Secretary of the Interior and the law officers of the United States to the effect that such land was a portion of the unallotted lands of such nations. That finding is presumptively correct. In addition, an appellate court may consider data not contained in the record in respect to the administrative interpretation placed upon a statute. Minnesota v. United States, 305 U.S. 382, 59 S.Ct. 292, 84 L.Ed. 235. It appears that in the larger number of instances running over a long period of years the administrative interpretation has been that the statute was without application to land in a proposed railroad right-of-way where no compensation had been paid the tribe, while in other instances it was interpreted as having application even though no compensation had been paid. It is a rule to which this court is firmly committed that in case of doubt great weight is properly given to the construction which the administrative agency charged with its administration has consistently given a statute over a long period of time. United States v. Jackson, 280 U.S. 183, 50 S.Ct. 143, 74 L.Ed. 361; Whitebird v. Eagle-Picher Lead Co., 10 Cir., 40 F.2d 479; City of Tulsa v. Southwestern Bell Telephone Co., 10 Cir., 75 F.2d 343; Globe Indemnity Co. v. Bruce, 10 Cir., 81 F.2d 143. But here there has been no consistent or uniform administrative construction placed upon the statute over a long period of time. It has been construed both ways, and for that reason the rule of administrative construction is inapplicable.

 Emphasis is placed upon the provision in the Atoka Agreement, 30 Stat. 505, and in the Supplemental Agreement, 32 Stat. 641, that an allottee shall not receive any land belonging to the tribe except that covered in his allotment, also that the allottees in question were compensated for the land excepted from their allotments. It is said that to hold title to the strip in question is vested in the owners of the legal subdivisions out of which the strip was carved would result in allowing each allottee or his present successor in interest land which was omitted from the allotment, in violation of the provision in the agreement and in violation of the spirit of equality in value in making allotments. Equalization in value was the underlying theory of the allotment scheme. But in dealing with these infrequent instances of abandonment of strips, Congress doubtless bore in mind the well known fact that the traversing of an allotment and the dividing of it into two separate tracts would inevitably bring about inconvenience and diminution in value which would more than offset the slight inequality in compensation to the allottee for the strip excepted in the first instance and restored on failure to pay compensation or abandonment for right-of-way purposes. In any event, Congress was free to depart in such infrequent instances from the plan of equalization in value, and it manifestly saw fit to do so for the purpose of avoiding the evils of title to narrow strips crossing allotments remaining in the tribe as remote dedicator.

 Argument is directed to the law of Oklahoma in respect to a provision in a deed or other instrument of conveyance excepting or excluding a strip for right-of-way purpose. It is urged that under the law of the state the provision in these patents excepted from the conveyance to the allottees the fee simple title to the stated number of acres in the proposed right-of-way. It cannot be doubted that in providing for the final disposition of the affairs of the tribes Congress was free to make such disposition as it chose of a strip set apart for a railroad right-of-way in which the company had an interest in the nature of an easement but failed to make payment of compensation or ceased to use the strip for the reserved purpose. For the reasons already stated we think section 14, supra, is controlling,—not the law of the state.

Other contentions are presented but the conclusion reached on the questions discussed eliminates need to consider them.

The decree is affirmed.