**SAND SPRINGS HOME, a corporation, Appellant,**

v.

**The STATE of Oklahoma ex rel. DEPART-
MENT OF HIGHWAYS of the State
of Oklahoma, Appellee.**

No. 46661.

Supreme Court of Oklahoma.

Feb. 25, 1975.

E. J. Doerner, William C. Anderson, Tulsa, and Erwin D. Phillips, Sand Springs, for appellant.

Allen D. Gray, Jr., Dept. of Highways, Oklahoma City, for appellee.

Andrew B. Allen, Asst. Dist. Atty., Tulsa, amicus curiae.

DOOLIN, Justice.

The parties to this controversy have stipulated to the pertinent facts and we are presented with a clear-cut proposition to decide. What effect has 30 Stat. 990 (*sometimes referred to as the Act of U. S. Congress of March 2, 1899*) had upon rights of way grants "made at the turn of the century" by Creek Indian allottees and/or the Creek Nation to the Missouri, Kansas and Texas Railroad (M.K.T. or Katy)?

We hold they created a limited fee or an easement.

Plaintiff (Appellant) deraigned its title in the property in question by various and mesne conveyances to the abutting properties and urges that the original rights of way grants in favor of the M.K.T. created easements only in the railroad, and thus reverted to the abutting successor owner. It alleges they were not grants of fee simple title because of the Congressional Act of March 2, 1899. The state does not challenge the correctness of Plaintiff's "chain of title", only Plaintiff's claims, if any, arising therefrom.

We know the Katy built, maintained and operated a branch line of its system over the premises in question until September of

1963. Prior to this date various meetings, conferences and correspondence had been held and transpired between the Oklahoma Highway Department, the U. S. Bureau of Public Roads, U. S. Corps of Engineers, Tulsa County, Oklahoma, and other interested parties in developing a modern vehicular expressway (Keystone Expressway) west from the cities of Tulsa and Sand Springs, Oklahoma. The discussions with reference to the expressway were prompted by the construction of the Keystone Reservoir, which would inundate and cut various sections of track of the Katy Railroad. Planning and negotiation progressed to the point that in May, 1960 the Katy contracted with the U. S. Corps of Engineers to convey its interests to the Corps, but the Katy was given an option (exerciseable by it at any time prior to December 30, 1964) to repurchase the railroad facilities concerned. Katy was required to obtain Interstate Commerce Commission approval for abandonment, relocation and alteration of the existing rights of way including the portion in question; which it did. As a part of the contract of May, 1960, the Katy was allowed, at its own risk, to use existing track over premises concerned to the Keystone Dam site. The use continued during the construction of the dam.

On August 30, 1963, the Katy and the U. S. Corps of Engineers executed a supplemental agreement to the contract of May, 1960, under which the railroad agreed not to exercise its option to repurchase and the railroad further agreed that it would discontinue operation of its line as of August 30, 1963. The Katy cut its line on September 19, 1963. The Corps of Engineers thereafter took possession of the Katy Railroad properties and advertised and sold the abandoned properties for salvage.

At the time of the supplemental agreement (August, 1963), several proposed routes for the vehicular expressway were under consideration, but neither Tulsa County nor the Department of Highways threatened condemnation of a right of way against the M.K.T. premises.

Negotiations after September 19, 1963, continued between M.K.T., the State Highway Department and Tulsa County and in April and May of 1966, the State Highway Department paid the Katy approximately $26,000 for the rights of way involved and took quit claim deeds. The Katy reserved to itself all minerals in and under the rights of way.

After the State of Oklahoma had completed and occupied the entire Keystone Expressway, including the premises in question, the Plaintiff, as successor in title to the original abutting and adjoining land owners, brought reverse condemnation proceedings, 66 O.S.1971 §§ 53–57 and 69 O. S.1971 § 1203, against the State of Oklahoma claiming a reversionary fee simple title to the rights of way by virtue of the Act of Congress of March 2, 1899. At the hearing on objections and exceptions to the report of commissioners, the State contended the abandonment of the rights of way on September 19, 1963, was under threat of condemnation and under the theory of Woodville v. United States, 152 F.2d 735 (10th C.A., 1946) and Midwestern Developments, Inc. v. City of Tulsa, 374 F.2d 683, 687 (10th C.A., 1967):

"There was no voluntary intent to abandon, and, therefore, no abandonment as a matter of law so as to terminate the easement."

The State also claimed that since the Katy had acquired a fee simple title under the Act of March 2, 1899, the State as successor in title had acquired fee simple title under the conveyance of 1963. The State also raised among other issues a claim of adverse possession of the premises.

In its journal entry of May 15, 1973, the trial court made findings of fact and conclusions of law supporting its judgment dismissing Appellant's action and this appeal resulted. In the findings of fact and conclusions of law the court found against the State under all of its theories except-

ing that the original rights of way grants had created a fee simple title in the Katy. The State made no appeal.

■ At the outset of our disposition of this case we are disposed to find that the public policy of the State of Oklahoma is subservient to the Acts of Congress, including the Act of March 2, 1899 (30 Stat. 990); see United States v. Magnolia Petroleum Co., 110 F.2d 212, 214 (10th C.A., 1939), where the editorial syllabus states:

> "In determining title to a strip of land which had been part of a proposed railroad right of way traversing land of Indian Tribe in Oklahoma, act of Congress for final disposition of the affairs of the tribe, rather than the law of Oklahoma was controlling. Act April 26, 1906, § 14, 34 Stat. 142."

We find it necessary to briefly note the historical background of this case. The Act of Congress of March 2, 1899 is by no means the genesis of the land policy reference Indian nations and tribes. Before the golden age of railroad construction the Indian aborigine and his rights had been systematically decimated and ignored, if not ruthlessly annihilated by the policies of the U. S. Government. Specifically as to the Creeks, we note that beginning in 1814, after losing a war to the U. S., the Nation was uprooted from Georgia and Alabama and moved to the future State of Oklahoma. As a result of having supported the Confederacy in 1861, the Creek territories in Oklahoma were further constricted. During these same historical times rail facilities were pushed westward by the pulse of civilization and the westward growth of population. The early policies reference railroad grants as established by Congress were outright grants in fee simple to railroad companies of millions of acres of land. As an example, see Northern Pacific Grant Act of July 2, 1864 (13 Stat. 365)

where 40,000,000 acres were affected. For a further review of this policy, see Justice Frankfurter's dissenting opinion in United States v. Union Pacific R.R. Co., 353 U.S. 112, 77 S.Ct. 685, 1 L.Ed.2d 693.

Ultimate dissatisfaction with the foregoing policies led to various acts of Congress too numerous to mention or to classify. By 1899 a more benign policy as to Indian lands, sympathetic in approach, had commenced; with certain exceptions, the concept of a "limited fee made on the implied condition of reverter" was adopted by many court decisions. See Northern Pacific R.R. Co. v. Townsend, 190 U.S. 267, 23 S.Ct. 671, 47 L.Ed. 1044.[1]

Turning to the instant case. The stipulated facts indicate that each of the original instruments executed by the Indian allottee or the Creek Tribe purported to grant a fee simple title to rights of way described therein; each, however, provided:

> "The deed is made . . . under the authority of the provisions of the Act of Congress of March 2, 1899 (30 Stat. 990)[2] and is intended to convey all such rights as said parties of the first part (Indian Nation or allottee) may lawfully convey to said party of the second part (M.K.T. R.R. Co.) under the provisions of the said law of Congress and the laws of the United States." (parenthetical phrases supplied.)

The Act of Congress of March 2, 1899, does not define nor spell out the nature of the estate created by such authorized grants, and "there's the rub", for many of the acts dealing with acquisition of rights of way state that an easement only is created and that a reversion follows abandonment to the abutting land owners or the municipality (34 Stat. 142), as the case may be.[3]

---

1. Cf. M. K. T. R.R. Co. v. Roberts, 152 U.S. 114, 14 S.Ct. 496, 38 L.Ed. 377.

2. 25 U.S.C.A. 312 et seq.

3. The following representative Acts affecting Oklahoma titles provide a reverter on abandonment:

Act of July 4, 1884 (23 Stat. 69) pertaining to the Gulf, Colorado and Santa Fe RR.

It is interesting to note upon further examination that the Act of March 2, 1899 (30 Stat. 990) at Sec. 6 incorporates Sec. 2 of the Act of Congress of March 3. 1875 (18 Stat. 482). Section 2 of the last mentioned Act of Congress has been interpreted by the U. S. Supreme Court in Great Northern R.R. Co. v. United States, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836:

"Section 2 [43 U.S.C.A. § 935] adds to the conclusion that the right granted is one of use and occupancy only, rather than the land itself, for it declares that any railroad whose right of way passes through a canyon, pass or defile 'shall not prevent any other railroad company from the *use and occupancy* of said canyon, pass, or defile, for the purposes of its road, *in common* with the road first located.'" (emphasis theirs.)

Further examination of the Basic Act of March 2, 1899 implies, at least to us, that less than a fee simple title was contemplated for forfeiture is provided for failure to complete within a given time; see Section 4 thereof. Section 5 of the Basic Act provides that the railroad must pay to the Tribe not less than $15 per mile annually for so long as the land shall be *"owned and occupied by* the tribe." Although Section 5 has been classified as a tax by the Supreme Court in Creek Nation v. United States, 318 U.S. 629, 637, 63 S.Ct. 784, 788, 87 L.Ed. 1046, 1052, the tax classification does not preclude this Court from stating that Section 5 also implies less than a fee simple title primarily because the payment required implies a remaining *ownership* in

the Tribe. The language of Sections 4 and 5 of the Basic Act does violence to a grant of fee simple absolute ownership.

We are referred to Midwestern Developments, Inc. v. City of Tulsa, 259 F.Supp. 554 (N.D.Okl., 1966) as the only case specifically dealing with the Act of Congress of March 2, 1899. In the second editorial syllabus that case states:

"Where lands allotted to Indian girl in Territory of Oklahoma in 1898 were restricted against alienation at time right-of-way deed to railroad was executed and could not be conveyed in fee simple, unless Act of Congress of 1899 under which railroad acquired right-of-way clearly and expressly authorized acquisition of fee simple title for railroad purposes, and that Act did not authorize acquisition of fee simple title, and right-of-way deed conveyed all such right as grantor might lawfully convey, right-of-way deed conveyed only easement. 25 U.S.C.A. § 312 et seq."

The State contends, however, that such a finding was *obiter dicta* and the case really turned upon a question of abandonment. The State suggests—threat of condemnation, Woodville v. United States, supra; the fact that State policy, Article IX, Sec. 6, Oklahoma Constitution, makes a railroad right of way a public highway; and, the facts [4]—were the rationale behind the decision. It further implies that since no appeal was made of the opinion of the U. S. Court for the Northern District of Oklahoma as to the estate created, the correctness of that portion of the opinion has not

Co.; Act of July 4, 1884 (23 Stat. 73) pertaining to the So. Kansas RR. Co.; Act of March 18, 1896 (29 Stat. 69) pertaining to the St. Louis and Oklahoma City RR. Co.; Act of February 28, 1902 (32 Stat. 43) pertaining to all railroads through Indian Territory; Act of March 3, 1899 (30 Stat. 1368) pertaining to Ft. Smith and Westery RR.; Act of April 26, 1906 (34 Stat. 137, 142) pertaining to final disposition of the affairs of Five Civilized Tribes.

Other Congressional Acts germane providing for no reverter on abandonment are:

Act of July 25, 1866 (14 Stat. 236) pertaining to the Kansas-Neosho Valley RR.; Act of July 27, 1866 (14 Stat. 292) pertaining to the Atlantic and Pacific RR. Co.; and, Act of July 1, 1902 (32 Stat. 641) Atoka Agreement.

4. The old Katy line (right of way) as originally *granted* still serves as a railroad right of way with vehicular traffic moving on each side of a part, if not all, of the original grant —thus, no abandonment.

been approved by the 10th Circuit Court. It is true that Judge Murrah, former Chief Judge 10th C.A., on appeal, in Midwestern Developments, Inc. v. City of Tulsa, 374 F.2d 683 (1967) at note three states:

"The city says it 'does not concede that the deed conveyed an easement, but feels that the determination of that question is unnecessary at this point'; later in its brief it opines that 'this court would probably construe the grant in question as conveying a base fee'. But, the trial court concluded that an easement only was conveyed. We are not asked to review that conclusion and assume its correctness."

We are not persuaded that the 10th C.A.'s opinion supports the State's position in the instant case.

█ In the case at bar we note that neither party suggests or has appealed the findings and conclusions of the trial court that the abandonment was completed on September 19, 1963. This fact and the other conclusions of the trial court have become "the law of the case." The State has likewise made no appeal on its right to claim adverse possession or the defense of involuntary condemnation (Woodville defense, supra). We therefore must squarely decide what estate was originally granted to the Katy 70-odd years ago.

█ We hold the estate created by the four deeds in question was limited to an easement and not a fee simple grant. Our own observations as to the contents and wording of the Basic Act of March 2, 1899 (30 Stat. 990 §§ 4 and 5) and the decision of the U. S. Supreme Court in Great Northern R.R. Co. v. United States, supra, reference Section 2 of the Act of March 3, 1875, further convince us that an easement was intended. We are not unmindful of the differences in the texts of the various Acts of Congress outlined in footnote 4, supra, but the inclusion or omission of a reverter clause in the given Act does not, in our opinion, fully represent Congressional opinion or offer grounds for disposi-

tion in favor of the State. Review of the cases heretofore cited, albeit distinguishable in fact, indicates that the courts in question have not been held to a strict or literal interpretation of the words in the various grants or acts. We believe that the following cases support the proposition that an easement was intended: United States v. Drumb, 152 F.2d 821 (10th C.A., 1946); Choctaw Nation v. AT&SF R.R. Co., 396 F.2d 578 (10th C.A., 1968); Northern Pacific R.R. v. Townsend, supra; Fitzgerald v. City of Ardmore, 281 F.2d 717 (10th C.A., 1960); St. Louis-San Francisco Ry. Co. v. Walter, 305 F.2d 90 (10th C.A., 1962); Gutensohn v. McGuirt, 194 Okl. 64, 147 P.2d 777 (1944); and United States v. Magnolia Petroleum Co., supra. For a further collection of cases as to the estate created, see 132 A.L.R. 142.

The trial court's order dismissing Appellant's cause of action is therefore reversed and said cause remanded for proceedings under Appellant's claim of reverse condemnation.

Reversed and remanded.

All Justices concur.