**Joe CAPURRO, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 344–78.**

United States Claims Court.

June 27, 1983.

use of vehicles on plaintiffs' property.

David R. Gamble, Carson City, Nev., with whom was Smith & Gamble, Ltd., Carson City, Nev., for plaintiffs.

Patricia N. Young, Washington, D.C., with whom was Asst. Atty. Gen., Carol E. Dinkins, Washington, D.C., for defendant.

## OPINION

KOZINSKI, Chief Judge.

Plaintiffs, in this Fifth Amendment action, charge that the United States has taken land belonging to them. The parties have stipulated the facts they deem material.

## FACTS

In issue is a 300 foot wide strip of land running through the middle of plaintiffs' ranch. It has a complicated history.

Sometime near the middle of the nineteenth century, plaintiffs' predecessor in interest, James Sutcliffe, began occupying 35 acres of public land in Nevada. He built a home and established a cattle ranch, believing the property to be his. In 1874, however, the United States created the Pyramid Lake Paiute Indian Reservation which included the land Sutcliffe was occupying. Sutcliffe protested the government's action,

but the United States refused to recognize his claim of title.

In 1910, the United States granted Central Pacific Railway a right-of-way through the reservation. 25 U.S.C. § 312. The designated path was over 50 miles long and passed directly through Sutcliffe's ranch. Knowing of Sutcliffe's claim, in 1911 the railroad took the precaution of securing from him a quitclaim deed covering the portion of the right-of-way crossing his ranch.

Congress later provided that property within the reservation which had been occupied by settlers for at least 21 years would be available for purchase by the occupants. Act of June 7, 1924, ch. 311, § 1, 43 Stat. 596. Accordingly, in 1924, the United States issued a land patent to Sutcliffe conveying to him approximately 25 acres of land situated on either side of the railroad right-of-way. The 300 foot strip itself was expressly excluded from the patent.

Southern Pacific Transportation Company eventually bought the right-of-way, using it until 1970 when it abandoned the railroad line. In 1972, the Pyramid Lake Paiute Tribe sued Southern Pacific to quiet title to the land underlying the abandoned right-of-way. To settle the suit, Southern Pacific executed a quitclaim deed passing any interest it possessed to the United States in trust for the Paiute Tribe. The United States caused that deed to be recorded in 1974.

In 1978, with Bureau of Indian Affairs contract authorizations and other assistance, the tribe's housing authority constructed a dwelling which partially encroached on the strip of land that is the subject of this suit.

Plaintiffs assert ownership over the strip and claim that the United States has taken it from them. Defendant disputes plain-

tiffs' ownership and argues that, in any case, no taking has occurred.

## DISCUSSION

### A. The Ownership Issue [1]

1. It is clear that plaintiffs have acquired no interest in the 300 foot strip of land from Sutcliffe. Sutcliffe did not obtain any right to the land by virtue of the 1924 patent since the patent specifically excluded the strip. Moreover, even if Sutcliffe had acquired an interest in the land through his occupancy, he quitclaimed it to the railroad in 1911. Sutcliffe therefore had no rights in the strip and could convey none to plaintiffs.

2. It is equally clear that the United States acquired no title to the property by virtue of the 1974 quitclaim deed from the railroad. The railroad acquired its interest in the strip of land under the Act of March 2, 1899, ch. 374, 30 Stat. 990 (codified at 25 U.S.C. § 312) (the 1899 Act). The act provides for creation of railroad rights-of-way through Indian land. The 1899 Act and the Act of March 3, 1875, ch. 152, 18 Stat. 482 (codified at 43 U.S.C. §§ 934–39) (the 1875 Act), pertaining to public land, are the principal federal statutes governing the establishment of railroad rights-of-way.

The Supreme Court has interpreted the 1875 Act as giving railroads only easements over the land on which their tracks are situated, not fees in the land itself. *Great Northern Railway v. United States,* 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1941).[2] Some of the statutory language on which the Court based its ruling also appears in the 1899 Act. *See, e.g.,* § 6 of the 1899 Act incorporating § 2 of the 1875 Act. Moreover, the Court identified an explicit policy decision by Congress to discontinue granting fee interests to railroads and to grant easements instead. 315 U.S. at 273–74.

---

1. This court may determine ownership of land in resolving a taking claim. *Malone v. Bowdoin,* 369 U.S. 643, 647 n. 8, 82 S.Ct. 980, 983 n. 8, 8 L.Ed.2d 168 (1962); *Yaist v. United States,* 228 Ct.Cl. 281, 285–86 (1981); *Bourgeois v. United States,* 212 Ct.Cl. 32, 35–36 n. 1, 545 F.2d 727 (1976).

2. Some prior acts had provided for conveyance of limited fees rather than easements. *See Great Northern Railway,* 315 U.S. at 277–78, 62 S.Ct. at 535–536.

The Court found that "[a]fter 1871 outright grants of public lands to private railroad companies seem to have been discontinued." *Id.* at 274. The statute and right-of-way in our case date well after 1871.

■ While the Supreme Court has never interpreted the 1899 Act, other courts have ruled that rights-of-way created under its authority constitute easements rather than fees. *Fitzgerald v. City of Ardmore,* 281 F.2d 717, 718 (10th Cir.1960); *Sand Springs Home v. State ex rel. Department of Highways,* 536 P.2d 1280, 1282–84 (Okl.1975). This court agrees. It follows that the railroad had only an easement over the strip until 1970 when it abandoned even that.

■ Nor did the railroad acquire any interest in the strip by virtue of the 1911 quitclaim deed from Sutcliffe. That deed was worthless since Sutcliffe had been occupying federally owned land without benefit of entry or patent. *See* 43 U.S.C. § 162; *Northern Pacific Railroad v. Colburn,* 164 U.S. 383, 386, 17 S.Ct. 98, 99, 41 L.Ed. 479 (1896); *United States v. Osterlund,* 505 F.Supp. 165, 168–69 (1981), *aff'd,* 671 F.2d 1267 (1982). Thus, Sutcliffe could pass no interest to the railroad in 1911; it, in turn, could convey none to the United States in 1974.

3. Plaintiffs argue that they acquired title to the land in 1970 by virtue of 43 U.S.C. § 912 which provides that when railroad rights-of-way are abandoned, title to the underlying property vests in the landowners whose land is traversed by the strip. However, section 912 by its terms applies only to rights-of-way through public land. The section is codified in Title 43 which governs the administration of public land.[3] The right-of-way here in issue passed over Indian land. It was granted under the 1899 Act which is codified in Title 25 (Indians).

Indian land may, under certain circumstances, be treated as public land. *See Nadeau v. Union Pacific Railroad,* 253 U.S. 442, 446, 40 S.Ct. 570, 571, 64 L.Ed. 1002 (1920); *Beecher v. Wetherby,* 95 U.S. 517,

523, 525, 24 L.Ed. 440 (1877). *But see Missouri, Kansas & Texas Railway v. United States,* 235 U.S. 37, 39–40, 35 S.Ct. 6, 7–8, 59 L.Ed. 116 (1914); *Leavenworth, Lawrence & Galveston Railroad v. United States,* 92 U.S. 733, 741–45, 23 L.Ed. 634 (1875); *Bennett County v. United States,* 394 F.2d 8, 11 (8th Cir.1968). Nevertheless, it is a special category of property as to which Congress has passed a separate series of laws collected in Title 25.

■ Included among the provisions for Indian land is a railroad right-of-way statute that is separate from the right-of-way statute for public land. *See* p. 724 *supra.* It is significant that Congress enacted section 912 in Title 43, governing the extinguishment of railroad rights-of-way on public land, but passed no similar provision in Title 25 governing the extinguishment of railroad rights-of-way on Indian land. Under these circumstances, it would be wholly inappropriate to apply section 912 here.

4. Since statutory guidance is lacking, the court must resort to common law principles in ascertaining ownership to the strip of land after the railroad abandoned the right-of-way. While an abundance of authority in this area is lacking, courts have generally held that under such circumstances the strip of land belongs to the fee owner of the adjacent land:

> It is a rule of general application that the servient estate in a strip of land burdened with an easement for a railroad right of way or other purposes passes with a conveyance of the fee to the abutting legal subdivision or tract out of which it was carved without express provision to that effect in the instrument of conveyance. Upon abandonment of the easement the dominant estate becomes extinguished and the entire title and estate vests in the owner of such abutting subdivision or tract.

*Fitzgerald,* 281 F.2d at 718 (footnote omitted) (citing *United States v. Magnolia Petroleum Co.,* 110 F.2d 212 (10th Cir.1939);

---

3. The 1875 Act also appears in Title 43. 43 U.S.C. §§ 934–39. Section 938 provides that

the act is generally inapplicable to Indian reservations.

*United States v. Drumb,* 152 F.2d 821 (10th Cir.1946)). *See also Sand Springs Home,* 536 P.2d at 1280.

■ It is significant that this rule was developed by courts in the western United States where this land is located. Courts familiar with local conditions are best suited to enunciate and interpret the law pertaining to real estate. The court adopts the quoted rule and holds that the strip of land in question accrued to the abutting estate which belonged to plaintiffs.

### B. *The Taking Issue*

■ Our predecessor, the Court of Claims, has held that the United States is not liable for the wrongful land claims of Indian tribes unless the claimants were acting within the scope of delegated authority. *Carlson v. United States,* 214 Ct.Cl. 1, 7–8, 556 F.2d 489 (1977); *Coast Indian Community v. United States,* 213 Ct.Cl. 129, 147–48, 550 F.2d 639 (1977). An Indian tribe generally has no authority to claim land on behalf of the United States. *See Carlson,* 214 Ct.Cl. at 7–8. Therefore, an unauthorized claim of title by a tribe does not constitute a taking of the land under the Fifth Amendment.

Here, however, there is more than mere assertion of title by the tribe. The United States has actively participated in the construction of a house on a portion of the property in question. Local agencies of the Bureau of Indian Affairs approved the necessary contracts and leases as part of a larger construction project, solicited bids, hired workers, inspected the building site and provided a foreman/superintendent to oversee the construction. It appears that government officials knew the house encroached on the land claimed by plaintiffs yet permitted and assisted in the construction.

■ Such active involvement by authorized federal agents in the construction of a building which physically invades plaintiffs' land constitutes a taking under the Fifth Amendment. *See Yuba Goldfields, Inc. v. United States,* 1 Cl.Ct. 421, 424–26 (1983) (MILLER, J.) & cases cited therein. How-ever, the taking is limited to that portion of the land upon which the house actually encroaches, plus that additional portion (if any) that may have been fenced off or otherwise rendered unusable by virtue of the construction.

■ The court rejects plaintiffs' argument that the United States took the remainder of the strip by recording the 1974 quitclaim deed from the railroad. To constitute a taking, recordation of a deed must be coupled with an intent expressed by authorized government officials to take possession of the land and exclude plaintiffs therefrom. *Yaist,* 228 Ct.Cl. at 286–88 & n. 4; *Yuba Goldfields,* 1 Cl.Ct. at 426. Here, the lawsuit giving rise to the quitclaim deed was initiated by the Indians; there is no indication that the United States participated in the litigation. On this record there is no evidence that the United States (as opposed to the Indians) has ever taken affirmative steps to assert possession over the entire strip or to exclude plaintiffs therefrom. Under the established case law, there was no taking as to that portion of the property not affected by the construction.

### CONCLUSION

The court holds that plaintiffs owned the strip of land in question and that the United States took a portion of it. The parties are directed to attempt to stipulate the value of the taking and file any such stipulation by July 27, 1983. If such a stipulation is filed, the clerk shall enter judgment in that amount with costs to plaintiffs as the prevailing parties.

If no stipulation is filed, the matter is set for a status hearing on July 28, 1983, at 10:00 a.m. EDT, in Courtroom No. 4, Fifth Floor, National Courts Building, 717 Madison Place, N.W., Washington, D.C. 20005. Plaintiffs' counsel, who practices outside Washington, D.C., may participate by telephone conference call to be placed by the court. At the status hearing, the parties shall be prepared to address the course of further proceedings.